## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRENDAN S. ROSS, M.D.,
Winged Foot Drive, Jackson, Mississippi

          Plaintiff,

v.

DEPARTMENT OF VETERANS AFFAIRS,

          Defendant.

Civil Action No. 1:07-cv-01163 (JDB)

**COMPLAINT**

Plaintiff, Brendan S. Ross, M.D. ("Dr. Ross"), for his Complaint in this action alleges the following on information and belief.

### NATURE OF THE ACTION

1.     This dispute arises out of Dr. Ross' concerns over the quality of patient care being accorded veterans at the Department of Veterans Affairs ("VA") G.V. (Sonny) Montgomery Medical Center in Jackson, Mississippi (the "Medical Center"). His repeated complaints with respect to certain outpatient care practices at the Medical Center led the Director of the Medical Center, Mr. Richard J. Baltz, to target Dr. Ross for termination. In order to effectuate this goal, the Administration of the Medical Center has violated the letter and subverted the intent of VA policies and regulations and deprived Dr. Ross of his statutory and constitutional rights.

2.     This is an action for equitable relief. It seeks to require the Defendant, the VA, to accord to Dr. Ross all rights to which he is due in connection with its attempt to discharge him from his tenured position as a physician at the Medical Center and to correct certain records concerning him maintained by the VA.

## THE PARTIES

3.      Dr. Ross is a medical doctor and a citizen of the United States.  He received his medical degree from the University of Virginia School of Medicine in 1988.  After residency training at Brown University and the Medical College of Georgia, he was board certified in internal medicine in 1991.  He received post-graduate training in clinical effectiveness at Harvard University's School of Public Health. He has been accorded practice privileges at seventeen (17) different hospitals in five (5) states in his career and has never previously had his practice privileges suspended, reduced or rescinded.  Dr. Ross is a medical researcher as well as a clinician.  He has taught internal medicine and pharmacology at the University of South Alabama School of Medicine and at the University of Mississippi School of Medicine.  Dr. Ross has published more than a dozen articles in peer-reviewed medical journals and has spoken at more than one hundred (100) medical conferences.  He is licensed to practice medicine in the Commonwealth of Virginia, the State of Alabama, and the State of Mississippi and is currently in good standing in each of those states.

4.      The VA is an agency of the United States with its principal office in the District of Columbia.  It is responsible for administering benefit programs and providing health care to veterans of the United States armed forces.  It operates the Medical Center and employs Dr. Ross.

## JURISDICTION AND VENUE

5.      This court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 552a(g)(1), 701-706.  The court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because the VA resides within the District of Columbia and pursuant to 5 U.S.C. §§ 552a(g)(5).

## FACTUAL BACKGROUND

7.      Dr. Ross began work at the Medical Center on or about July 2, 2000. Since then, he has worked as a primary care physician at the Medical Center continuously to the present time. Dr. Ross is a "tenured" VA physician under 38 U.S.C. § 7401(1) and is entitled as a matter of right to certain employment protections, including the right to due process before any major adverse employment action such as discharge is taken against him.

8.      The outpatient medical care of neuro-psychiatrically impaired patients is so unique and so demanding that the Medical Center decided to establish a special medical clinic to be run by an expert in providing primary care to such patients. The Medical Center called this special clinic, the "Silver Clinic." It was an innovative approach to the medical care of neuro-psychiatrically impaired veterans in a number of ways. The Silver Clinic, unlike other outpatient medical clinics, was to be placed administratively under and physically co-located within the Medical Center's Psychiatric Services, making it easy for patients to obtain coordinated psychiatric and medical care. And, by retaining a medical director for the Silver Clinic who had special expertise, neuro-psychiatrically impaired patients would receive improved medical care. Moreover, by concentrating all such patients at the Medical Center in one clinic, it necessarily changed the composition of all other primary care clinics, improving the efficiency with which medical care was provided for veterans who were not neuro-psychiatrically impaired.

9.      Once the Silver Clinic was established, its patient cohort consisted entirely of veterans who were neuro-psychiatrically impaired. Most of these patients were also on multiple psychotropic medications. The Silver Clinic was administratively placed under and physically

co-located within the Medical Center's Psychiatric Services. The Silver Clinic provided only outpatient medical care; it did not provide psychiatric care.

10.    Dr. Ross was hired to serve as the Medical Director of this innovative primary care clinic. Dr. Ross was the only physician assigned to the Silver Clinic. He was assisted by three nurse practitioners. It was represented to Dr. Ross by the Administration of the Medical Center at the time he was hired that the patient panel for which he would serve as primary care provider at the Silver Clinic would be between 600 and 800 active patients and that additional scheduling time (vis-à-vis other clinics at the Medical Center) would be afforded each patient visit. These representations were true at the outset.

11.    The first years of this innovative effort at addressing the special medical needs of neuro-psychiatrically impaired veterans indicated that this approach held great promise. In late 2002 - early 2003, however, the Administration of the Medical Center made a dramatic change in the Silver Clinic. The Administration of the Medical Center realized that it could not bill Medicare or private insurers for Dr. Ross' services as long as the Silver Clinic was within Psychiatric Services. It could bill for his services if the Silver Clinic was not within Psychiatric Services. In order to maximize insurance revenue and in complete disregard for patient care, the Director of the Medical Center ordered the Silver Clinic to be placed administratively within Nursing Services (which had administrative purview over the other primary care clinics), cut its staff, increased the number of patients assigned each provider, reduced the time allotted for each patient encounter and physically relocated it to less advantageous clinic space within the Medical Center, thereby adversely changing its connection with Psychiatric Services.

12.    Dr. Ross was concerned that these changes would have an adverse impact on the quality of patient care. As his concerns became realized, Dr. Ross reported to his supervisors

and the Administration of the Medical Center these concerns about patient care. In particular, he reported that his clinic should be supervised by a physician, preferably a psychiatrist, not a nurse lacking in any specialized training in psychiatry. He also reported that the ratio of patients to provider and ancillary personnel was inappropriate to meet quality care standards. He also reported that the examination rooms in the clinic were poorly equipped. Of particular importance, however, was the fact that, once the Silver Clinic was brought into line with the other primary care clinics by the order of Nursing Services, he was only permitted to spend twenty (20) minutes on each patient encounter, rather than the thirty (30) – forty (40) minutes permitted when under the purview of Psychiatric Services. These and other concerns about patient care were ignored by the Administration of the Medical Center.

13.     Dr. Ross' continued complaints about patient care and efforts to obtain extramural scrutiny of the quality of outpatient medical care at the Medical Center, led Mr. Baltz and the Administration to target him for separation from the Medical Center. In or about 2005, the Administration reassigned Dr. Ross to the "Blue I Clinic" which again relocated him within the Medical Center. As part of this action, the Administration disclaimed that it would any longer pursue the innovative approach of concentrating all neuro-psychiatrically impaired patients in a single clinic for outpatient medical service. The Administration, however, did not make any changes in the patient cohort assigned to Dr. Ross. In fact, it further concentrated neuro-psychiatrically impaired patients in his patient panel, as the Silver Clinic's patients assigned to nurse practitioners were detailed to him upon their reassignments. Eventually, the patient panel for which Dr. Ross would be the primary care provider doubled in size from approximately 600 active patients to approximately 1200 active patients with no increase in support. The intent of these changes was to create the impression that Dr. Ross' clinic was less efficient and viewed by

the patients in a less favorable light than other outpatient medical clinics within the Medical Center, notwithstanding that no comparison of Dr. Ross' clinic with the other clinics or physicians is possible given the *sui generis* nature of his clinic's patient cohort. In short, the Administration was setting Dr. Ross up for failure. Moreover, it knew that Dr. Ross would recognize this and hoped that he would voluntarily resign from the VA.

14.    As part of its efforts to drive Dr. Ross out of the Medical Center, the Administration initiated a series of petty disciplinary actions against Dr. Ross. His superiors misapplied leave policy as set forth in the Medical Center's Labor-Management Agreement. They demanded that notice of leave be provided ninety (90) days in advance, a policy applicable only to clinic scheduling changes. Dr. Ross' efforts to comply with this illegitimate mandate led to additional job stress, and when he attempted to secure an emergency leave, he was charged with failing to follow the leave policy and disciplinary action was brought against him. The Administration also began to enforce staff bylaws requiring medical encounter notes be recorded during the course of each patient examination thereby further limiting face-to-face patient care time and inciting patients to complain. This bylaw had never previously been strictly enforced. Yet, when Dr. Ross seemingly failed to comply strictly with it, disciplinary action was brought against him.

15.    In the Summer or early Fall of 2006, Mr. Baltz realized that Dr. Ross was not going to resign voluntarily from the VA. Accordingly, by memorandum dated September 11, 2006, he established a three-person Administrative Board of Investigation ("AIB") to investigate allegations of "inappropriate conduct/communication" by Dr. Ross allegedly based on "complaints of patients, families, and staff." In fact, however, no such complaints had ever been filed. Significantly, the AIB was not charged with investigating Dr. Ross' patient care. Indeed,

because of the fact that no physician who practiced internal medicine was appointed to the AIB, it would have been impossible for the AIB to evaluate any issue of patient care. Dr. Ross was not notified of the initiation of this investigation.

16.    On or about November 7, 2006, Dr. Ross received a telephone call from the Chairperson of the AIB, Ms. Tricia Mathias, a nutritionist employed by the Medical Center. Ms. Mathias requested that Dr. Ross appear before a three (3) member panel for an "interview." Ms. Mathias did not identify her inquiry as being part of an AIB, did not tell Dr. Ross he was a subject of investigation and did not provide him with notice under the Privacy Act. This is the first time that Dr. Ross became aware of the existence of an investigation. Dr. Ross advised Ms. Mathias that she should direct any such request to his legal counsel. Dr. Ross' legal counsel immediately contacted Ms. Mathias and asked for the basis of her authority, the subject matter of the investigation, the identities of the members of the AIB, the identity of any witnesses and the substance of their testimony. In a subsequent telephone call, Ms. Matthias declined to provide any of this information, but conceded that witnesses were giving testimony under oath that was being recorded stenographically, despite her characterization of these contacts as merely "interviews." Dr. Ross' counsel made a formal request for this information to Ms. Mathias by letter dated November 24, 2006. By letter dated December 24, 2006, the Director of the Medical Center, not Ms. Mathias, responded to this request by providing a copy of the September 11, 2006 memorandum establishing the AIB and a copy of VHA Handbook 0700. This letter reiterated that the purpose of the investigation was exclusively limited to "allegations of . . . inappropriate conduct/communications."

17.    By memorandum dated January 17, 2007, Ms. Mathias issued Dr. Ross a "Direct Order to Give Testimony" under threat of discipline if refused. That memorandum stated that

Dr. Ross has "no 'due process' rights to advance notice, or to notice of charges, nor do you have

the right to review or challenge adverse evidence." Dr. Ross informed Ms. Mathias that he could

not be available on the date set for his appearance, but would arrange a subsequent date.

18.    On January 30, 2007, Dr. Ross was confronted in his clinic by the Acting Chief of

Police of the Medical Center. Dr. Ross was issued a memorandum from Mr. Baltz ordering that

Dr. Ross be placed on administrative leave and that he be escorted off the premises of the

Medical Center. That memorandum stated: "you are ordered not to have any further

communication with any medical center employee during the period of inquiry into this matter."

Dr. Ross was not allowed to remove any of his personal belongings from the clinic. Dr. Ross

was also locked out of the Medical Center's computer network. The police paraded Dr. Ross

through the common areas of the Medical Center, in front of his waiting patients and staff,

making a great show of removing him from the premises. VHA Handbook 5021 (which governs

Disciplinary Procedures) states that placing an employee in a paid non-duty status while an

investigation is ongoing is "unusual" and should be a "last resort."

19.    Dr. Ross appeared before the AIB on February 12 and 13, 2007. His testimony

was taken under oath and stenographically recorded. Although he was allowed to have counsel

present, his counsel was not allowed to participate in the proceeding. At no point during the

proceeding was Dr. Ross apprised of the nature of the charges against him, the substance of the

alleged complaints about him or the identities of the patients who had purportedly lodged the

complaints. In contravention of VA policy, the AIB did not confront Dr. Ross, the subject of the

investigation, with specific instances, dates, times, locations, and statements for him to

comprehend sufficiently and to respond fully to the purported concerns that had triggered

establishment of the AIB. Dr. Ross was allowed to present a statement to the AIB. In that

statement, Dr. Ross made clear that he believed he had been targeted by Mr. Baltz for termination due to his reports to supervisors regarding the poor quality of outpatient medical care being provided to neuro-psychiatrically impaired veterans at the Medical Center and his assertion of his employee rights during a previous disciplinary hearing.

20.    Within days of making these critical comments about Mr. Baltz and the quality of patient care at the Medical Center, Mr. Baltz by letter dated February 22, 2007, personally and summarily suspended Dr. Ross' clinical privileges at the Medical Center.  Mr. Baltz took this action without warning or notice, let alone consultation with Dr. Ross' medical supervisors, and without first attempting other remedial options.  Moreover, Dr. Ross had fully complied with the Director's order of Administrative Leave and had not returned to the Medical Center.  Nor was Dr. Ross providing patient care.  Therefore, Dr. Ross was not disrupting Medical Center functions nor did he pose a potential danger to patients.  Mr. Baltz clearly took this action in retribution for Dr. Ross' criticism of him before the AIB.  Indeed, Mr. Baltz is not a medical doctor and, therefore, in no position to evaluate Dr. Ross' fitness to practice at the Medical Center.  This action was taken without reference to or recommendation from the Chief of Staff or Executive Committee of the Medical Center and without providing the reason(s) for the change in privileges, all of which is required by VHA Handbook 1100.19.  Mr. Baltz's letter also seemed for the first time to expand the scope of investigation into "patient safety concerns," even though no such charge was ever given to the AIB.  The letter also stated that if the investigation resulted in a reduction or revocation of privileges, "a report will be filed with the NPDB [National Practitioner Data Bank] with a copy to the appropriate State Licensing Board in all states in which you currently hold a license. . . ." (emphasis added).  On March 5, 2007, Dr. Ross requested the disclosure of the basis for the suspension of his clinical privileges.  To this day, no

response has ever been given to this request, suggesting that there was no legitimate basis for Mr. Baltz's action. This failure to respond also violates VHA Handbook 1100.19(6)(g)(2), which allows a practitioner notice of and access to evidence on which a change in privileges is based.

21.    On June 5, 2007, a "Proposed Discharge Memorandum" was issued by the Chief of Medical Services of the Medical Center, Dr. Stephen A. Geraci. Appended to this Memorandum and in support of the proposed discharge of Dr. Ross, was a second memorandum, dated May 25, 2007, and simply captioned "Douglas Factors." Dr. Geraci was not a member of the AIB nor did he participate in the investigation. Moreover, Dr. Geraci did not review the evidence collected by the AIB and did not prepare either memoranda. Indeed, at the time Dr. Ross was placed on administrative leave, Dr. Geraci told Dr. Ross that he had not been called to testify by the AIB and that "he was unaware of any issue of professional conduct or competence that warranted such action" against Dr. Ross. Dr. Geraci simply signed each memoranda as a ministerial matter, apparently at the direction of Mr. Baltz.

22.    On June 7, 2007, Dr. Ross advised Dr. Geraci in writing of a number of factual errors in the Douglas Factors Memorandum relating to the records maintained by the VA about him. In reply, Dr. Geraci stated that this matter was being handled by the Director personally and forwarded the request to Mr. Baltz. To this day, Dr. Ross has not received a response.

23.    The Proposed Discharge Memorandum was served upon Dr. Ross on June 6, 2007. It stated that Dr. Ross had a mere fourteen (14) calendar days to respond to the evidence developed by the AIB during its almost nine-month investigation. This response could be provided in writing and/or at a hearing before a "decision officer." It also advised Dr. Ross that the decision officer who would make the final decision on discharge would be Mr. Baltz despite his obvious bias against Dr. Ross and lack of qualifications to judge appropriate patient care. It

10

also stated that "[i]f it is the decision of the Center Director that you be discharged, your discharge will be effective not less than 30 calendar days from the day after the receipt of this notice." (emphasis added). In other words, the discharge would be effective long before any administrative or judicial review of the discharge could be obtained by Dr. Ross. It also stated that, if he is terminated, the VA, pursuant to its policy, will report Dr. Ross to the state licensing board. This would result in Dr. Ross losing his license to practice medicine and being unable to pursue his chosen profession in which he has invested more than twenty-five (25) years of education and training to become a specialist in internal medicine. Again, this would happen long before Dr. Ross could obtain any administrative or judicial review.

24.     The Proposed Discharge Memorandum also stated that Dr. Ross would be provided with "[t]he evidence on which this notice of proposed action is based . . . ." This evidence was not provided to Dr. Ross until late on June 8, 2007, further shortening his time to reply to the false charges made against him. Moreover, when this "evidence" was provided, it constituted approximately two thousand (2,000) pages of documents and transcripts from the almost nine-month long AIB investigation, requiring more than a week for Dr. Ross and his counsel to review.

25.     Review of the AIB "evidence" revealed that Dr. Ross was not provided with certain significant information. For example, and without limitation, the names and contact information of patients whose hearsay statements were used against Dr. Ross were not provided, thus denying Dr. Ross the opportunity to contact them to obtain affidavits in support of his position. In addition, Dr. Ross was not provided with the records of patients, staff or employees contacted by the AIB, but whose testimony was not taken because it was favorable to Dr. Ross.

26.    Of particular significance, because Dr. Ross was barred from the Medical Center premises, he could not consult the medical records, including his patient encounter notes, maintained exclusively in electronic form on the Medical Center's computer network. This information is critical to Dr. Ross' ability to respond to the false charges against him because all but one of the these charges relate to patient medical care. By letter dated June 6, 2007, Dr. Ross requested access to these medical records. By letter dated June 7, 2007, Mr. Baltz denied access to these records. The VA could have no fear that Dr. Ross would tamper with these records, as all entries are time-stamped and electronically stored. Dr. Ross' review could have been electronically monitored or he could have been granted "read only" opportunities to review this exculpatory material.

27.    In preparation for the hearing before Mr. Baltz, Dr. Ross requested in writing that he be allowed to make his presentation using PowerPoint to highlight inconsistencies in the AIB testimony. By letter dated June 7, 2007, Mr. Baltz denied this request. Dr. Ross also requested in writing that the hearing be set for two (2) days in order to have sufficient time to review the evidence and explain to Mr. Baltz why the charges are inaccurate. By letter dated June 7, 2007, Mr. Baltz denied this request and allocated only two (2) hours to review the six (6) charges and twenty-three (23) specifications against Dr. Ross. These limitations belie the assurance provided in the Memorandum of Proposed Discharge that his reply would be given a "full and impartial consideration" and VHA Handbook 5021's promise that he would be provided an opportunity to make any reasonable plea or argument he believed might influence the decision official.

28.    In his almost seven (7) years working as a physician at the Medical Center, Dr. Ross has been the primary treating physician for more than 3,500 different patients. He has had more than 30,000 patient encounters -- instances in which he examined and/or treated a patient

either by appointment or urgent care visit. During that time, no patient had ever complained about harm or adverse medical consequence as a result of Dr. Ross' lack of competence. Before the AIB, Dr. Ross expressly asked the AIB to disclose any instance in which his professional care was negligent or harmed a patient. The AIB failed to identify any such instance.

29.    Dr. Ross has never received an unsatisfactory proficiency rating in any of his annual reviews at the Medical Center. Dr. Ross has never received any written counseling from his line supervisors in regard to deficient medical practices or VA regulation adherence. He has never been ordered to attend remedial education or training. Indeed, Dr. Ross' Official Personnel File contains no reports of tardiness, disruption of clinic procedures, complaints from nurses or staff about unprofessional conduct, falsification of records or any of the other practices with which he is now charged.

30.    In more than eighteen (18) years of medical practice and more than 75,000 patient contacts, no patient has ever complained about harm or adverse medical consequence as a result of his lack of competence or due to poor quality of medical care received. No report about Dr. Ross has ever been made to the NPDB. No complaint has ever been filed against him with any state medical licensure board or physician review board. Moreover, in an age in which medical malpractice litigation has run amuck, Dr. Ross has never been sued for negligent medical care.

31.    Despite vigorous efforts by the Director and Administration of the Medical Center to uncover dissatisfied patients, including the outrageous practice of "cold-calling" large numbers of his patients to encourage them to complain about Dr. Ross, only ten (10) patients could be found who, after improper prodding and leading questions by AIB members, seemed to recollect an unsatisfactory experience with Dr. Ross. Each of these ten (10) patients have serious neurologic or psychiatric conditions requiring the attention of mental health specialists and/or the

use of psychotropic drugs. Moreover, each of the alleged complaints (if they can even be called that) happened long before the patient testimony at the AIB -- including one incident that had occurred three years previously.

32.     As a result of the VA's actions, Dr. Ross has suffered and will continue to suffer irreparable harm to his reputation; deprivation of his constitutionally protected liberty and property interests, his right to practice his chosen profession of medicine; and a deprivation of his constitutionally protected due process rights.

33.     Dr. Ross has no adequate remedy at law.

34.     Absent injunctive relief, Dr. Ross will continue to suffer irreparable harm by the VA's actions.

## COUNT I

35.     Paragraphs 1 – 34 are repeated and realleged as if fully set forth herein.

36.     By statute, regulation and internal policy, the VA has guaranteed to its Section 7401(1) employees certain rights relating to their employment as a VA employee. By way of example and without limitation, these rights include:

      a.    that an AIB conduct any investigation in accord with VHA Handbook 0700 and, in particular, that such investigation be conducted in a fair and impartial manner by personnel adequately trained therein;

      b.    that said employee be entitled to legal representation at any interview which includes a right of counsel to participate;

      c.    that a physician's practice privileges not be suspended, reduced or rescinded except in accordance with the procedures set out in VHA Handbook 1100.19;

      d.    that the decision official acting upon a discharge recommendation be fair and unbiased;

      e.    that said employee be entitled to obtain all evidence upon which charges against him are based and free and unfettered access to all VA records needed to address those charges;

f.     that said employee be permitted adequate time to present to the decision official any plea or argument said employee deems proper;

g.     that said employee be allowed representation by counsel before the decision official and counsel be allowed to participate in said representation;

h.     that a purported former disciplinary action which is a legal nullity not be used to enhance punishment against said employee; and

i.     that only accurate VA records will be used in any disciplinary action against said employee.

37.     Dr. Ross has a cause of action pursuant to 5 U.S.C. §§ 701-706 for the VA's failure to accord him these rights.

## COUNT II

38.     Paragraphs 1 – 37 are repeated and realleged as if fully set forth herein.

39.     Dr. Ross is entitled to a due process hearing before any decision to discharge him takes effect.

40.     Dr. Ross is entitled to a due process hearing before any decision to reduce or rescind his practice privileges at the Medical Center takes effect.

41.     Dr. Ross is entitled to a due process hearing before any decision to report him to state licensure boards and the NPDB is implemented.

42.     The VA refuses to provide Dr. Ross with a due process hearing prior to:

a.     discharging Dr. Ross from the VA;

b.     reducing or rescinding Dr. Ross' practice privileges at the Medical Center; and

c.     reporting Dr. Ross to state licensure boards and the NPDB.

43.     Dr. Ross has a cause of action pursuant to 5 U.S.C. §§ 701-706 for the VA's refusal to provide him a due process hearing.

**COUNT III**

44.     Paragraphs 1 – 43 are repeated and realleged as if fully set forth herein.

45.     Even if the VA wanted to provide Dr. Ross with a due process hearing prior to his

discharge taking effect and prior to a rescission of his practice privileges taking effect and prior

to reporting him to state licensure boards and the NPDB, it would be unable to do so because:

        a.      the AIB's improper conduct of its investigation tainted certain witnesses
                against Dr. Ross;

        b.      the AIB's refusal to allow Dr. Ross to be present and to confront witnesses
                during their testimony created a false, incomplete and/or misleading
                record;

        c.      the AIB's failure to notify Dr. Ross of its investigation in a timely manner
                and the long time it took in completing its investigation allowed evidence
                to be lost or destroyed and memories to go stale; and

        d.      the VA's order barring Dr. Ross from talking to witnesses, patients, staff
                and/or employees and barring him from the Medical Center allowed
                evidence to be lost or destroyed and memories to go stale.

46.     Each of the foregoing and other VA actions too numerous to list here have so

prejudiced Dr. Ross' ability to defend himself that it is impossible for the VA at this late date to

provide a due process hearing for Dr. Ross.  In other words, the failings of the investigative and

initial decision-making process have already deprived Dr. Ross of his rights for which he has a

cause of action pursuant to 5 U.S.C. §§ 701-706.

**COUNT IV**

47.     Paragraphs 1 – 46 above are repeated and realleged as if fully set forth herein.

48.     On or about June 6, 2007, Dr. Ross learned of certain factual inaccuracies in the

records maintained by the VA about him.  For example and not by way of limitation, a May 25,

2007 memorandum states:  "At no time did Dr. Ross convey to service leadership any issues

which could be considered mitigating to these behaviors . . . ."  This is incorrect.  On April 8,

2005, Dr. Ross notified the Chief of Staff of the Medical Center and the Chief of Medical Services in writing that he had been subjected to unusual job stress and needed to obtain counseling for his "failure to adequately cope with and appropriately respond to work stressors." Dr. Ross subsequently reported in writing that he had to take short-term medication therapy in addition to counseling for this problem.

49.    On June 7, 2007, Dr. Ross notified Dr. Geraci in writing of these inaccuracies and requested an amendment of the records maintained by the VA. Dr. Geraci acknowledged receipt of this request for an amendment on June 8, 2007. The VA did not "promptly" make the requested corrections nor did it inform Dr. Ross of its refusal to amend, the reasons therefore and procedures for review of its decision. To this day, the VA has neither corrected Dr. Ross' records nor refused to do so.

50.    The failure of the VA to maintain an accurate record in this respect of Dr. Ross is particularly egregious because that inaccurate record has been and is being used against Dr. Ross to support a determination which is adverse to him.

51.    The VA has failed to maintain Dr. Ross' records with such accuracy, relevance, timeliness and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to Dr. Ross that may be made on the basis of such record, and consequently a determination has been made adverse to Dr. Ross.

52.    The VA's actions and failure to act constitute a violation of the Privacy Act, 5 U.S.C. § 552a.

WHEREFORE, Dr. Ross prays for judgment in his favor and against the VA as follows:

A.      Enjoining the VA from discharging Dr. Ross; reducing/rescinding Dr. Ross' practice privileges at the Medical Center; and/or reporting Dr. Ross to any State Licensing Board or the NPDB, until after he has had a due process hearing in connection with such action and said hearing receives judicial review;

B.      Barring Mr. Baltz from having any further involvement in disciplinary actions relating to Dr. Ross and directing the VA to appoint an unbiased and impartial decision official to review the proposed discharge of Dr. Ross;

C.      Directing the VA to accord Dr. Ross sufficient time to make any argument or plea to the decision official appointed to replace Mr. Baltz; that at such presentation he be allowed to use PowerPoint or any other electronic devices reasonably necessary to make his presentation; and that such presentation be stenographically recorded;

D.      Directing the VA to make available to Dr. Ross all records necessary for him to respond to the proposed discharge, including but not limited to, access to any electronic medical records maintained on the Medical Center's computer network; the names and contact information for all patients, staff or employees whose testimony or statements were incorporated into the AIB's Findings to the Convening Authority or the Charging Official's evidence file; and all information developed by the AIB that might exonerate Dr. Ross of the charges made against him;

E.      Enjoining the VA from considering an unauthorized prior disciplinary action against Dr. Ross in any disciplinary action subsequent to that incident;

F.      Directing the VA to amend the records it maintains on Dr. Ross to reflect accurately his medical conditions as set forth in his June 7, 2007 letter to Dr. Geraci;

G.    Declaring that the conduct of the AIB in conducting its investigation was biased and result oriented; exceeded the scope of its authorization; failed to meet the requirements of VHA Handbook 0700; and, therefore, its actions are null and void and lacking in any legal effect;

H.    Declaring that the summary suspension of Dr. Ross' practice privileges at the Medical Center was improper and unlawful and directing the VA to reinstate immediately Dr. Ross' practice privileges at the Medical Center; expunge from all VA records any indication that Dr. Ross' practice privileges had ever been reduced or rescinded; and enjoining the VA from reducing or rescinding Dr. Ross' practice privileges at the Medical Center in the future without first providing him due process and conforming to VA requirements;

I.    Awarding Dr. Ross all attorneys' fees and costs incurred; and

J.    Granting such other and further relief as the Court may deem just.

Respectfully Submitted,

Dated:  June 29, 2007

Terence P. Ross (D.C. Bar # 376062)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Suite 300
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorney for Plaintiff Brendan S. Ross, M.D.

100248119_1.DOC

19

## I (a) PLAINTIFFS

BRENDAN M. ROSS, M.D.

## DEFENDANTS

DEPARTMENT OF VETERANS AFFAIRS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Terence P. Ross (D.C. Bar # 376062)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

○ 3 Federal Question
   (U.S. Government Not a Party)

◉ 2 U.S. Government
   Defendant

○ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

◉ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>***(If pro se, select this deck)*** | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions (if Privacy Act)**<br><br>***(If pro se, select this deck)*** | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

◉ **1 Original Proceeding**  ○ **2 Removed from State Court**  ○ **3 Remanded from Appellate Court**  ○ **4 Reinstated or Reopened**  ○ **5 Transferred from another district (specify)**  ○ **6 Multi district Litigation**  ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Violation of Administrative Procedures Act, 5 U.S.C. 701-706, and Privacy Act of 1974, 5 U.S.C. 552a

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23    **DEMAND $** [____]  Check YES only if demanded in complaint    **JURY DEMAND:**  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

**DATE** _____  **SIGNATURE OF ATTORNEY OF RECORD** _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

**IV.**  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.