### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRENDAN S. ROSS, M.D., )<br><br>Plaintiff, )<br><br>v. )<br><br>DEPARTMENT OF VETERANS AFFAIRS, )<br><br>Defendant. ) | Civil Action No. 07-1163 (JDB) |

### PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff, Brendan S. Ross, M.D., ("Dr. Ross"), pursuant to Rule 65(b) of the Federal

Rules of Civil Procedure, respectfully moves this Court for entry prior to close of business on

July 10, 2007 of a temporary restraining order in the form appended hereto for the purpose of

maintaining the *status quo* pending briefing and argument of a motion for preliminary injunction.

In support of this motion, Dr. Ross is simultaneously filing herewith a memorandum of points

and authorities in support of said motion.  Appended to that memorandum is a sworn declaration

by Dr. Ross supporting the factual averments underling the motion and true and correct copies

(as verified by Dr. Ross) of all documents relevant to this motion.

Respectfully Submitted,

Dated:  July 2, 2007

/s/ Terence P. Ross
Terence P. Ross (D.C. Bar # 376062)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Suite 300
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorneys for Plaintiff Brendan S. Ross, M.D.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRENDAN S. ROSS, M.D., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 07-1163 (JDB) |
| DEPARTMENT OF VETERANS AFFAIRS, | ) |
| Defendant. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

This memorandum is submitted in support of Plaintiff, Brendan S. Ross' ("Dr. Ross")

Motion for a Temporary Restraining Order.

## INTRODUCTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Dr. Ross seeks a

temporary restraining order to preserve the *status quo* pending an opportunity for the parties to

brief and argue to this Court, and for this Court to consider, a motion for preliminary injunction.

This case involves the proposed discharge of a tenured physician of the Department of Veterans

Affairs ("VA"). The decision to discharge Dr. Ross could occur as early as July 10, 2007. The

VA has advised Dr. Ross that the discharge would immediately become effective and that it then

will rescind his practice privileges at the VA's G.V. (Sonny) Montgomery Medical Center in

Jackson, Mississippi (the "Medical Center"); will report him to the state licensure board for

revocation of his license to practice medicine; and will report him to the National Practitioners

Data Bank (NPDB") in order to prevent him from practicing medicine anywhere in the United

States. All of the foregoing will occur <u>before</u> Dr. Ross receives a due process hearing from the

VA.  Moreover, the VA has declined to agree to postpone the effective date of discharge pending review.  This is a clear deprivation of Dr. Ross' constitutionally protected liberty and property interests.  Accordingly, Dr. Ross is seeking interim relief to preserve the *status quo* pending a due process hearing by the VA and judicial review thereof.

## FACTUAL BACKGROUND

1.      Dr. Ross began work at the Medical Center on or about July 2, 2000.  Since then, he has worked as a primary care physician at the Medical Center continuously to the present time.  Dr. Ross is a "tenured" VA physician under 38 U.S.C. § 7401(1) and is entitled as a matter of right to certain employment protections, including the right to due process before any major adverse employment action such as discharge is taken against him.  (Declaration of Brendan S. Ross ("Ross Dec."), ¶ 2).

2.      The outpatient medical care of neuro-psychiatrically impaired patients is so unique and so demanding that the Medical Center decided to establish a special medical clinic to be run by an expert in providing primary care to such patients.  The Medical Center called this special clinic, the "Silver Clinic."  It was an innovative approach to the medical care of neuro-psychiatrically impaired veterans in a number of ways.  The Silver Clinic, unlike other outpatient medical clinics, was to be administratively placed under and physically co-located within the Medical Center's Psychiatric Services, making it easy for patients to obtain coordinated psychiatric and medical care.  And, by retaining a medical director for the Silver Clinic who had special expertise, neuro-psychiatrically impaired patients would receive improved medical care.  Moreover, by concentrating all such patients at the Medical Center in one clinic, it necessarily changed the composition of all other primary care clinics, improving the efficiency with which

medical care was provided for veterans who were not neuro-psychiatrically impaired. (Ross Dec., ¶ 3).

3.     Once the Silver Clinic was established, its patient cohort consisted entirely of veterans who were neuro-psychiatrically impaired. Most of these patients were also on multiple psychotropic medications. The Silver Clinic was administratively placed under and physically co-located within the Medical Center's Psychiatric Services. The Silver Clinic provided only outpatient medical care; it did not provide psychiatric care. (Ross Dec., ¶ 4).

4.     Dr. Ross was hired to serve as the Medical Director of this innovative primary care clinic. Dr. Ross was the only physician assigned to the Silver Clinic. He was assisted by three nurse practitioners. It was represented to Dr. Ross by the Administration of the Medical Center at the time he was hired that the patient panel for which he would serve as primary care provider at the Silver Clinic would be between 600 and 800 active patients and that additional scheduling time (vis-à-vis other clinics at the Medical Center) would be afforded each patient visit. These representations were true at the outset. (Ross Dec., ¶ 5).

5.     The first years of this innovative effort at addressing the special medical needs of neuro-psychiatrically impaired veterans indicated that this approach held great promise. In late 2002 - early 2003, however, the Administration of the Medical Center made a dramatic change in the Silver Clinic. The Administration of the Medical Center realized that it could not bill Medicare or private insurers for Dr. Ross' services as long as the Silver Clinic was within Psychiatric Services. It could bill for his services if the Silver Clinic was not within Psychiatric Services. In order to maximize insurance revenue and in complete disregard for patient care, the Director of the Medical Center ordered the Silver Clinic to be placed administratively within Nursing Services (which had administrative purview over the other primary care clinics), cut its

staff, increased the number of patients assigned each provider, reduced the time allotted for each patient encounter and physically relocated it to less advantageous clinic space within the Medical Center,  thereby adversely changing its connection with Psychiatric Services.  (Ross Dec., ¶ 6).

6.      Dr. Ross was concerned that these changes would have an adverse impact on the quality of patient care.  As his concerns became realized, Dr. Ross reported to his supervisors and the Administration of the Medical Center these concerns about patient care.  In particular, he reported that his clinic should be supervised by a physician, preferably a psychiatrist, not a nurse lacking in any specialized training in psychiatry.  He also reported that the ratio of patients to provider and ancillary personnel was inappropriate to meet quality care standards.  He also reported that the examination rooms in the clinic were poorly equipped.  Of particular importance, however, was the fact that, once the Silver Clinic was brought into line with the other primary care clinics by the order of Nursing Services, he was only permitted to spend twenty (20) minutes on each patient encounter, rather than the thirty (30) – forty (40) minutes permitted when under the purview of Psychiatric Services.  These and other concerns about patient care were ignored by the Administration of the Medical Center.  (Ross Dec., ¶ 7).

7.      Dr. Ross' continued complaints about patient care and efforts to obtain extramural scrutiny of the quality of outpatient medical care at the Medical Center, led Mr. Baltz and the Administration to target him for separation from the Medical Center.  In or about 2005, the Administration reassigned Dr. Ross to the "Blue I Clinic" which again relocated him within the Medical Center.  As part of this action, the Administration disclaimed that it would any longer pursue the innovative approach of concentrating all neuro-psychiatrically impaired patients in a single clinic for outpatient medical service.  The Administration, however, did not make any changes in the patient cohort assigned to Dr. Ross.  In fact, it further concentrated neuro-

psychiatrically impaired patients in his patient panel, as the Silver Clinic's patients assigned to nurse practitioners were detailed to him upon their reassignments.  Eventually, the patient panel for which Dr. Ross would be the primary care provider doubled in size from approximately 600 active patients to approximately 1200 active patients with no increase in support.  The intent of these changes was to create the impression that Dr. Ross' clinic was less efficient and viewed by the patients in a less favorable light than other outpatient medical clinics within the Medical Center, notwithstanding that no comparison of Dr. Ross' clinic with the other clinics or physicians is possible given the *sui generis* nature of his clinic's patient cohort.  In short, the Administration was setting Dr. Ross up for failure.  Moreover, it knew that Dr. Ross would recognize this and hoped that he would voluntarily resign from the VA.  (Ross Dec., ¶ 8).

8.    As part of its efforts to drive Dr. Ross out of the Medical Center, the Administration initiated a series of petty disciplinary actions against Dr. Ross.  His superiors misapplied leave policy as set forth in the Medical Center's Labor-Management Agreement. They demanded that notice of leave be provided ninety (90) days in advance, a policy applicable only to clinic scheduling changes.  Dr. Ross' efforts to comply with this illegitimate mandate led to additional job stress, and when he attempted to secure an emergency leave, he was charged with failing to follow the leave policy and disciplinary action was brought against him.  The Administration also began to enforce staff bylaws requiring medical encounter notes be recorded during the course of each patient examination thereby further limiting face-to-face patient care time and inciting patients to complain.  This bylaw had never previously been strictly enforced. Yet, when Dr. Ross seemingly failed to comply strictly with it, disciplinary action was brought against him.  (Ross Dec., ¶ 9).

9.      In the Summer or early Fall of 2006, Mr. Baltz realized that Dr. Ross was not going to resign voluntarily from the VA.  Accordingly, by memorandum dated September 11, 2006, he established a three-person Administrative Board of Investigation ("AIB") to investigate allegations of "inappropriate conduct/communication" by Dr. Ross allegedly based on "complaints of patients, families, and staff."  (Ross Dec., Tab 1).  In fact, however, no such complaints had ever been filed.  Significantly, the AIB was not charged with investigating Dr. Ross' patient care.  Indeed, because of the fact that no physician who practiced internal medicine was appointed to the AIB, it would have been impossible for the AIB to evaluate any issue of patient care.  Dr. Ross was not notified of the initiation of this investigation.  (Ross Dec., ¶ 10).

10.     On or about November 7, 2006, Dr. Ross received a telephone call from the Chairperson of the AIB, Ms. Tricia Mathias, a nutritionist employed by the Medical Center.  Ms. Mathias requested that Dr. Ross appear before a three (3) member panel for an "interview."  Ms. Mathias did not identify her inquiry as being part of an AIB, did not tell Dr. Ross he was a subject of investigation and did not provide him with notice under the Privacy Act.  This is the first time that Dr. Ross became aware of the existence of an investigation.  Dr. Ross advised Ms. Mathias that she should direct any such request to his legal counsel.  Dr. Ross' legal counsel immediately contacted Ms. Mathias and asked for the basis of her authority, the subject matter of the investigation, the identities of the members of the AIB, the identity of any witnesses and the substance of their testimony.  In a subsequent telephone call, Ms. Matthias declined to provide any of this information, but conceded that witnesses were giving testimony under oath that was being recorded stenographically, despite her characterization of these contacts as merely "interviews."  Dr. Ross' counsel made a formal request for this information to Ms. Mathias by letter dated November 24, 2006.  By letter dated December 24, 2006, the Director of the Medical

Center, not Ms. Mathias, responded to this request by providing a copy of the September 11, 2006 memorandum establishing the AIB and a copy of VHA Handbook 0700.  This letter reiterated that the purpose of the investigation was exclusively limited to "allegations of . . . inappropriate conduct/communications."  (Ross Dec., ¶ 11 and Tabs 2-3).

11.     By memorandum dated January 17, 2007, Ms. Mathias issued Dr. Ross a "Direct Order to Give Testimony" under threat of discipline if refused.  That memorandum stated that Dr. Ross has "no 'due process' rights to advance notice, or to notice of charges, nor do you have the right to review or challenge adverse evidence."  Dr. Ross informed Ms. Mathias that he could not be available on the date set for his appearance, but would arrange a subsequent date.  (Ross Dec., ¶ 12 and Tab 4).

12.     On January 30, 2007, Dr. Ross was confronted in his clinic by the Acting Chief of Police of the Medical Center.  Dr. Ross was issued a memorandum from Mr. Baltz ordering that Dr. Ross be placed on administrative leave and that he be escorted off the premises of the Medical Center.  That memorandum stated: "you are ordered not to have any further communication with any medical center employee during the period of inquiry into this matter." Dr. Ross was not allowed to remove any of his personal belongings from the clinic.  Dr. Ross was also locked out of the Medical Center's computer network.  The police paraded Dr. Ross through the common areas of the Medical Center, in front of his waiting patients and staff, making a great show of removing him from the premises.  VHA Handbook 5021 (which governs Disciplinary Procedures) states that placing an employee in a paid non-duty status while an investigation is ongoing is "unusual" and should be a "last resort."  (Ross Dec., ¶ 13 and Tab 5).

13.     Dr. Ross appeared before the AIB on February 12 and 13, 2007.  His testimony was taken under oath and stenographically recorded.  Although he was allowed to have counsel

present, his counsel was not allowed to participate in the proceeding. At no point during the proceeding was Dr. Ross apprised of the nature of the charges against him, the substance of the alleged complaints about him or the identities of the patients who had purportedly lodged the complaints. In contravention of VA policy, the AIB did not confront Dr. Ross, the subject of the investigation, with specific instances, dates, times, locations, and statements for him to comprehend sufficiently and to respond fully to the purported concerns that had triggered establishment of the AIB. Dr. Ross was allowed to present a statement to the AIB. In that statement, Dr. Ross made clear that he believed he had been targeted by Mr. Baltz for termination due to his reports to supervisors regarding the poor quality of outpatient medical care being provided to neuro-psychiatrically impaired veterans at the Medical Center and his assertion of his employee rights during a previous disciplinary hearing. (Ross Dec., ¶ 14).

14.    Within days of making these critical comments about Mr. Baltz and the quality of patient care at the Medical Center, Mr. Baltz by letter dated February 22, 2007, personally and summarily suspended Dr. Ross' clinical privileges at the Medical Center. Mr. Baltz took this action without warning or notice, let alone consultation with Dr. Ross' medical supervisors, and without first attempting other remedial options. Moreover, Dr. Ross had fully complied with the Director's order of Administrative Leave and had not returned to the Medical Center. Nor was Dr. Ross providing patient care. Therefore, Dr. Ross was not disrupting Medical Center functions nor did he pose a potential danger to patients. Mr. Baltz clearly took this action in retribution for Dr. Ross' criticism of him before the AIB. Indeed, Mr. Baltz is not a medical doctor and, therefore, in no position to evaluate Dr. Ross' fitness to practice at the Medical Center. This action was taken without reference to or recommendation from the Chief of Staff or Executive Committee of the Medical Center and without providing the reason(s) for the change

in privileges, all of which is required by VHA Handbook 1100.19.  Mr. Baltz's letter also seemed for the first time to expand the scope of investigation into "patient safety concerns," even though no such charge was ever given to the AIB.  The letter also stated that if the investigation resulted in a reduction or revocation of privileges, "a report <u>will</u> be filed with the NPDB [National Practitioner Data Bank] with a copy to the appropriate State Licensing Board in all states in which you currently hold a license. . . ."  (emphasis added).  On March 5, 2007, Dr. Ross requested the disclosure of the basis for the suspension of his clinical privileges.  To this day, no response has ever been given to this request, suggesting that there was no legitimate basis for Mr. Baltz's action.  This failure to respond also violates VHA Handbook 1100.19(6)(g)(2), which allows a practitioner notice of and access to evidence on which a change in privileges is based. (Ross Dec., ¶ 15 and Tabs 6-7).

15.    On June 5, 2007, a "Proposed Discharge Memorandum" was issued by the Chief of Medical Services of the Medical Center, Dr. Stephen A. Geraci.  Appended to this Memorandum and in support of the proposed discharge of Dr. Ross, was a second memorandum, dated May 25, 2007, and simply captioned "Douglas Factors."  Dr. Geraci was not a member of the AIB nor did he participate in the investigation.  Moreover, Dr. Geraci did not review the evidence collected by the AIB and did not prepare either memoranda.  Indeed, at the time Dr. Ross was placed on administrative leave, Dr. Geraci told Dr. Ross that he had not been called to testify by the AIB and that "he was unaware of any issue of professional conduct or competence that warranted such action" against Dr. Ross.  Dr. Geraci simply signed each memoranda as a ministerial matter, apparently at the direction of Mr. Baltz.  (Ross Dec., ¶ 16 and Tab 8).

16.    On June 7, 2007, Dr. Ross advised Dr. Geraci in writing of a number of factual errors in the Douglas Factors Memorandum relating to the records maintained by the VA about

him.  In reply, Dr. Geraci stated that this matter was being  handled by the Director personally and forwarded the request to Mr. Baltz.  To this day, Dr. Ross has not received a response.  (Ross Dec., ¶ 17 and Tabs 9-10).

17.    The Proposed Discharge Memorandum was served upon Dr. Ross on June 6, 2007.  It stated that Dr. Ross had a mere fourteen (14) calendar days to respond to the evidence developed by the AIB during its almost nine-month investigation.  This response could be provided in writing and/or at a hearing before a "decision officer."  It also advised Dr. Ross that the decision officer who would make the final decision on discharge would be Mr. Baltz despite his obvious bias against Dr. Ross and lack of qualifications to judge appropriate patient care.  It also stated that "[i]f it is the decision of the Center Director that you be discharged, your discharge will be effective not less than 30 calendar days from the day after the receipt of this notice."  (emphasis added).  In other words, the discharge would be effective long before any administrative or judicial review of the discharge could be obtained by Dr. Ross.  It also stated that, if he is terminated, the VA, pursuant to its policy, will report Dr. Ross to the state licensing board.  This would result in Dr. Ross losing his license to practice medicine and being unable to pursue his chosen profession in which he has invested more than twenty-five (25) years of education and training to become a specialist in internal medicine.  Again, this would happen long before Dr. Ross could obtain any administrative or judicial review.  (Ross Dec., ¶ 18).

18.    The Proposed Discharge Memorandum also stated that Dr. Ross would be provided with "[t]he evidence on which this notice of proposed action is based . . . ."  This evidence was not provided to Dr. Ross until late on June 8, 2007, further shortening his time to reply to the false charges made against him.  Moreover, when this "evidence" was provided, it constituted approximately two thousand (2,000) pages of documents and transcripts from the

almost nine-month long AIB investigation, requiring more than a week for Dr. Ross and his counsel to review. (Ross Dec., ¶ 19).

19.     Review of the AIB "evidence" revealed that Dr. Ross was not provided with certain significant information. For example, and without limitation, the names and contact information of patients whose hearsay statements were used against Dr. Ross were not provided, thus denying Dr. Ross the opportunity to contact them to obtain affidavits in support of his position. In addition, Dr. Ross was not provided with the records of patients, staff or employees contacted by the AIB, but whose testimony was not taken because it was favorable to Dr. Ross. (Ross Dec., ¶ 20).

20.     Of particular significance, because Dr. Ross was barred from the Medical Center premises, he could not consult the medical records, including his patient encounter notes, maintained exclusively in electronic form on the Medical Center's computer network. This information is critical to Dr. Ross' ability to respond to the false charges against him because all but one of the these charges relate to patient medical care. By letter dated June 6, 2007, Dr. Ross requested access to these medical records. By letter dated June 7, 2007, Mr. Baltz denied access to these records. The VA could have no fear that Dr. Ross would tamper with these records, as all entries are time-stamped and electronically stored. Dr. Ross' review could have been electronically monitored or he could have been granted "read only" opportunities to review this exculpatory material. (Ross Dec., ¶ 21 and Tabs 11-12).

21.     In preparation for the hearing before Mr. Baltz, Dr. Ross requested in writing that he be allowed to make his presentation using PowerPoint to highlight inconsistencies in the AIB testimony. By letter dated June 7, 2007, Mr. Baltz denied this request. Dr. Ross also requested in writing that the hearing be set for two (2) days in order to have sufficient time to review the

evidence and explain to Mr. Baltz why the charges are inaccurate. By letter dated June 7, 2007,

Mr. Baltz denied this request and allocated only two (2) hours to review the six (6) charges and

twenty-three (23) specifications against Dr. Ross. Dr. Ross will not be allowed to call witnesses

at this proceeding. The date for Mr. Baltz to meet with Dr. Ross and decide upon the proposed

discharge was set for July 10, 2007. (Ross Dec., ¶ 22 and Tabs 13-14). By letter dated June 26,

2007, Dr. Ross requested that the VA agree to suspend the effective date of any discharge

pending a review of such decision. The VA has not responded to that request. (Ross Dec., ¶ 23,

Tab 15).

22.     In his almost seven (7) years working as a physician at the Medical Center, Dr.

Ross has been the primary treating physician for more than 3,500 different patients. He has had

more than 30,000 patient encounters -- instances in which he examined and/or treated a patient

either by appointment or urgent care visit. During that time, no patient had ever complained

about harm or adverse medical consequence as a result of Dr. Ross' lack of competence. Before

the AIB, Dr. Ross expressly asked the AIB to disclose any instance in which his professional

care was negligent or harmed a patient. The AIB failed to identify any such instance. (Ross

Dec., ¶ 24).

23.     Dr. Ross has never received an unsatisfactory proficiency rating in any of his

annual reviews at the Medical Center. Dr. Ross has never received any written counseling from

his line supervisors in regard to deficient medical practices or VA regulation adherence. He has

never been ordered to attend remedial education or training. Indeed, Dr. Ross' Official Personnel

File contains no reports of tardiness, disruption of clinic procedures, complaints from nurses or

staff about unprofessional conduct, falsification of records or any of the other practices with

which he is now charged. (Ross Dec., ¶ 25).

24.     In more than eighteen (18) years of medical practice and more than 75,000 patient contacts, no patient has ever complained about harm or adverse medical consequence as a result of his lack of competence or due to poor quality of medical care received.  No report about Dr. Ross has ever been made to the NPDB.  No complaint has ever been filed against him with any state medical licensure board or physician review board.  Moreover, in an age in which medical malpractice litigation has run amuck, Dr. Ross has never been sued for negligent medical care. (Ross Dec., ¶ 26).

25.     Despite vigorous efforts by the Director and Administration of the Medical Center to uncover dissatisfied patients, including the outrageous practice of "cold-calling" large numbers of his patients to encourage them to complain about Dr. Ross, only ten (10) patients could be found who, after improper prodding and leading questions by AIB members, seemed to recollect an unsatisfactory experience with Dr. Ross.  Each of these ten (10) patients have serious neurologic or psychiatric conditions requiring the attention of mental health specialists and/or the use of psychotropic drugs.  Moreover, each of the alleged complaints (if they can even be called that) happened long before the patient testimony at the AIB -- including one incident that had occurred three years previously.  Dr. Ross has not been allowed to confront or cross-examine any of these witnesses.  (Ross Dec., ¶ 27).

26.     As a result of the VA's actions, Dr. Ross has suffered and will continue to suffer irreparable harm to his reputation; deprivation of his constitutionally protected liberty and property interest, his right to practice his chosen profession of medicine; and a deprivation of his constitutionally protected due process rights.  In addition, Dr. Ross will be denied the great satisfaction he derives from practicing medicine and helping patients.  (Ross Dec., ¶ 28).

27.     Dr. Ross has no adequate remedy at law.  (Ross Dec., ¶ 29).

28.    Absent injunctive relief, Dr. Ross will continue to suffer irreparable harm by the

VA's actions.  (Ross Dec., ¶ 30).  Indeed, even if Dr. Ross is later cleared of the charges against

him, the stigma of a discharge for the alleged reasons will "hang like a cloud" over his head for

the remainder of his medical career.  (*Id.*).

## ARGUMENT

## I.    The Four-Factor Test Favors Maintaining The *Status Quo*.

In deciding whether to grant injunctive relief, this Court must consider four factors.

1.    Has the petitioner made a strong showing that he is likely to prevail on the merits?

2.    Has the petitioner shown that without such relief he will be irreparably injured?

3.    Would the relief sought substantially harm any other interested party?

4.    Does the public interest favor such relief?

*E.g., Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006);

*WMATA v. Holiday Tours, Inc.*, 559 F. 2d 841, 843 (D.C. Cir. 1977); *Virginia Petroleum*

*Jobbers Ass'n v. FPC*, 259 F. 2d 921, 925 (D.C. Cir. 1958).  In considering these factors, the

Court must engage in a balancing process.  "If the arguments for one factor are particularly

strong, an injunction may issue even if the arguments in other areas are rather weak."  *CityFed*

*Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).

## A.    Dr. Ross Is Likely To Prevail On The Merits.

Dr. Ross claims that he will be deprived of liberty and property – his tenured position at

the Medical Center, his ability to practice medicine and his reputation/standing as a medical

doctor – without due process of law.[1]  The Supreme Court has held that an employee has a

---

[1]    Dr. Ross also asserts in this lawsuit (among other claims) a violation of his rights under
the Privacy Act, 5 U.S.C. § 552a.  Dr. Ross, without waiving these claims, does not rely upon
them here.

constitutionally protected property interest in tenured employment. *E.g., Perry v. Sindermann*, 408 U.S. 593, 601 (1972). Similarly, the Supreme Court has held that there is a constitutionally protected liberty interest "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him. . . ." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). *Accord Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). *See also Paul v. Davis*, 424 U.S. 693, 710-12 (1976) (requiring some tangible alteration of a "status" – such as loss of employment – in addition to an injury to reputation in order to recognize a liberty interest). Thus, in *Doe v. DOJ*, 753 F. 2d 1092 (D.C. Cir. 1985), the District of Columbia Circuit held that the discharge of a lawyer from the Department of Justice on the grounds of "unprofessional conduct" constituted a deprivation of the lawyer's protected liberty interest. 753 F. 2d at 1104-06.

In this case, Dr. Ross has cognizable property and liberty interests at stake. Dr. Ross is a tenured VA physician pursuant to 38 U.S.C. § 7401(1). (Ross Dec., ¶ 2). This is a constitutionally protected property interest. *See Perry v. Sindermann*, 408 U.S. at 601. In addition, the combination of Dr. Ross' discharge <u>and</u> the VA's assertions that it is based upon "misrepresentation of medical records," "unprofessional behavior," and "endangering the safety of patients" creates a cognizable liberty interest. (Ross Dec., Tab 8.) *See Doe v. DOJ*, 753 F. 2d at 1104-06 ("government defamation accompanied by the loss of government employment would support a liberty interest claim").

Once a constitutionally protected property or liberty interest is established, the federal government may only take away such an interest <u>after</u> according the owner of such interest due process of law. U.S. Const. amend. V. In the context of termination of a tenured government employee, at a minimum the employee is entitled to "oral or written notice of the charges against

him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Implicit within these minimum requirements for due process are a right of access to employer documents to show that charges are untrue; a right to confront witnesses when the evidence "consists of the testimony of individuals whose memory might be faulty," and a right to present his own evidence in a fair manner to an unbiased decisionmaker. *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (contractor entitled to due process including access to records and cross-examination of witnesses prior to revocation of government security clearance). *See also Amos Treat & Co. v. SEC*, 306 F. 2d 260, 263-65 (D.C. Cir. 1962) ("due process might be said to mean at least 'fair play,'" including an "impartial and disinterested" decisionmaker); *Lindsay v. Kissinger*, 367 F. Supp. 949, 953 (D.D.C. 1973) (Foreign Service officers entitled to due process prior to discharge including "full access to all materials" and an opportunity "to interrogate adverse witnesses" before a hearing).

Dr. Ross will not be accorded these minimum due process rights <u>prior</u> to the effective date of his discharge, revocation of privileges, and report to state licensing boards and the NPDB. Dr. Ross has been denied access to records at the Medical Center which would exonerate him. (Ross Dec., ¶ 21 and Tabs 11-12). Dr. Ross has not been provided with the names and contact information of patients whose statements were used against him. (*Id.* at ¶ 20). Dr. Ross has not been provided with an opportunity to confront and cross-examine witnesses with psychological problems, memory problems and/or who were on psychotropic drugs at the time of their testimony. (*Id.* at ¶¶ 12, 27 and Tab 4). Dr. Ross will not be allowed to call witnesses in support of his position. (*Id.* at Tab 8). Dr. Ross will only have two (2) hours to present his response to six charges and twenty-seven specifications, despite the fact that the VA recommends that eight to sixteen hours generally be allowed for complex cases such as this. (*Id.*

at ¶ 22 and Tab 14).  And, the VA has designated a biased agency official, Mr. Baltz, as the

decision officer.  (*Id.* at *passim*).[2]

Given the foregoing, it is clear that Dr. Ross will not receive a due process hearing prior

to his discharge despite an entitlement to one.  Accordingly, there is a substantial likelihood that

Dr. Ross will prevail on the merits of his claims in this lawsuit.

**B.      Dr. Ross Will Be Irreparably Harmed If A TRO Is Not Granted.**

Absent the issuance of a temporary restraining order, Dr. Ross will be irreparably harmed

and nothing this Court or any other body can do subsequently will remedy that harm.  On July

10, 2007, the VA will make a decision whether to discharge Dr. Ross allegedly for

unprofessional conduct, falsification of records and endangering the safety of patients.  (Ross

Dec., ¶ 22).[3]  Dr. Ross has requested that the VA stay the effective date of any discharge until he

has received the due process hearing to which he is entitled.  (*Id.* at ¶ 23 and Tab 15).  The VA

has not agreed to this request.

This matter, however, is not merely about a discharge under stigmatizing circumstances.

The VA has informed Dr. Ross that upon discharge, his practice privileges *will* be revoked and

he *will* be reported to state licensing boards and the NPDB.  (Ross Dec., ¶ 18 and Tab 8).  This

---

[2]     Mr. Baltz is considered an interested person for these purposes because he initiated the
investigation, placed Dr. Ross on administrative leave, and suspended Dr. Ross' practice
privileges after Dr. Ross criticized the poor quality of outpatient medical care afforded veterans
at the Medical Center due to Mr. Baltz's poor administration.  *See Amos Treat & Co., Inc. v.
SEC*, 306 F. 2d at 266-65 (government employee who initiates investigation cannot then
participate in due process adjudication); *Hoberman v. Lock Haven Hospital*, 377 F. Supp. 1178,
1185-86 (M.D. Pa. 1974) (due process violated when doctor who initiated charges against fellow
doctor for misconduct then sat on committee that reviewed those charges).

[3]     The June 5, 2007 Memorandum of Proposed Discharge states that the discharge will
become effective thirty (30) days after receipt of the Memorandum.  (Ross. Dec., Tab 8).  Dr.
Ross received the Memorandum on June 6, 2007.  (*Id.* at ¶ 18).  Thus, the discharge can become
effective on July 10, 2007.

will result in the suspension or revocation of his license to practice medicine and prevent him from finding employment in his chosen profession anywhere in the United States. (*Id.*). Even if Dr. Ross is later vindicated, the stigma will continue to haunt him. The state licensing boards and NPDB will note his reinstatement, but they do not expunge the prior record. Moreover, whenever he applies for a new position, he will have to explain the gap in practice time on his *curriculum vitae* leaving potential employers with questions about his clinical competence and integrity. (Ross Dec., ¶ 30).

In circumstances such as presented here in which a plaintiff will be permanently stigmatized prior to a due process hearing and without regard to the ultimate disposition of the matter, courts have found irreparable harm to exist. In *Saunders v. George Washington University*, 768 F. Supp. 843 (D.D.C. 1991), this Court found irreparable injury existed when a professor's contract had not been renewed allegedly because she was black. The Court held that "harm to her career and professional reputation from an interruption in service would be irreparable." 768 F. Supp. at 845. The interruption in her career would always "cast a cloud" over future employment opportunities, even if she was ultimately vindicated by the judicial process. *Id.* Moreover, she "would lose the opportunity to gain satisfaction [from her career in teaching] that cannot be adequately compensated by a damages award." *Id.*

Similarly, in *McVeigh v. Cohen*, 983 F. Supp. 215 (D.D.C. 1998), this Court found irreparable harm existed when a U.S. Naval officer was threatened with discharge due to allegations of homosexual conduct. The Court noted that the plaintiff would "lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer." 983 F. Supp. at 221. Moreover, "Plaintiff will be separated from a position which is

central to his life. . . ." *Id.  See also Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (loss of "rights as a Marine" constitutes irreparable harm).

These cases are indistinguishable from the circumstances of Dr. Ross' situation. Accordingly, irreparable harm exists.

### C.    The Issuance Of A TRO Will Not Cause Cognizable Harm To The VA.

The VA may argue in opposition to this motion three potential harms.  First, the VA may argue that the health and safety of patients is a paramount interest.  Such an argument, however, is irrelevant here as Dr. Ross has been placed on administrative leave and, therefore, is not seeing or treating patients.  (Ross Dec. at Tab 5).  Moreover, Dr. Ross has been barred from the Medical Center by order of Mr. Baltz and, thus, cannot even come into contact with patients. (*Id.*)

Second, the VA may argue that it has an administrative interest in the expeditious handling of disciplinary matters.  Such an interest, however, is wholly undercut here given that the VA took nine months to complete its investigation with none of that delay attributable to Dr. Ross.  Moreover, the VA's administrative interest surely does not exceed the property and liberty interests of a tenured physician with more than seven (7) years service to the VA.

Third, the VA may argue that it has a financial interest in that it will be forced to continue to pay Dr. Ross' salary if the discharge is not effective immediately.  Because there is a strong likelihood that Dr. Ross will prevail in this matter, the VA would eventually have to compensate him for lost salary anyway.  *See Saunders*, 768 F. Supp. at 846.  Moreover, it is well settled that economic harm in and of itself is not the type of cognizable harm that should be considered.  *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

    **D.**    **The Public Interest Supports Issuance Of A TRO.**

No harm will befall the public from issuance of a temporary restraining order.  As discussed above, Dr. Ross is not seeing or treating patients because he is on administrative leave and barred from the premises of the Medical Center.  (Ross Dec., Tab 8).  In contrast, there is an inherent public interest in protecting the constitutional rights of Dr. Ross.  Moreover, that overriding interest more than justifies any minor financial or administrative burden that may be placed upon the VA by issuance of injunctive relief.

**II.**    **The Court Has The Power To Preserve The *Status Quo*
In These Circumstances.**

Dr. Ross seeks this temporary restraining order *prior* to the actual effective date of any discharge or the reporting thereof to licensing authorities.  Dr. Ross is compelled to do this because once the stigma of discharge for purportedly endangering patients, unprofessional conduct and falsification of records attaches, it attaches itself to Dr. Ross for all time, even if later proven false.  Once the bell is rung, it cannot be unrung.

The Administrative Procedure Act ("APA") expressly grants the Court the power to preserve the *status quo* in such circumstances.  Section 705 of the APA provides in pertinent part:

> On such conditions as may be required and to the extent necessary
> to prevent irreparable injury, the reviewing court . . . may issue all
> necessary and appropriate process to postpone the effective date of
> an agency action or to preserve status or rights pending conclusion
> of the review proceedings.

5 U.S.C. § 705.  Where, as here, an agency has declined to suspend or postpone pending review the effective date of some action that will have irreparable harm, a district court that will be asked to review such action clearly may do so instead of the agency in order to preserve the *status quo*.

The District of Columbia Circuit has repeatedly held that a party does not have to await a final administrative action by an agency "where the agency has very clearly violated an important constitutional or statutory right."  *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 710 (D.C. Cir. 1971) (*citing Amos Treat & Co. v. SEC*, 306 F.2d 260, 267 (D.C. Cir. 1962)).  *Sterling Drug* involved the denial of a fair hearing, while *Amos Treat* involved a biased decisionmaker.  The circumstances of Dr. Ross are indistinguishable from the facts of these cases.  Moreover, in *Daly-Murphy v. Winston*, 832 F.2d 348 (9th Cir. 1987), the Ninth Circuit held, in the context of a temporary suspension of a VA physician, that: "Exhaustion of administrative remedies is not required where the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff or where the administrative proceedings themselves are void. . . .'" 837 F.2d at 354 (*quoting United Farm Workers v. Arizona Agr. Employment*, 669 F.2d 1249, 1253 (9th Cir. 1982)).  As discussed above, Dr. Ross clearly will suffer an irreparable injury if this Court does not act prior to completion of the administrative process.  Accordingly, this Court can and should act now to preserve the *status quo*.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that his Motion for a Temporary

Restraining Order be granted and an order in the form appended hereto be issued immediately.


Respectfully Submitted,


Dated:  July 2, 2007                    /s/ Terence P. Ross
                                        Terence P. Ross (D.C. Bar # 376062)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue N.W.
                                        Suite 300
                                        Washington, D.C.  20036
                                        Telephone: (202) 955-8500
                                        Facsimile: (202) 467-0539

                                        Attorneys for Plaintiff Brendan S. Ross, M.D.

ROSS- Memo of Points and Authorities.doc

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2007, I caused to be delivered the foregoing Motion for Temporary Restraining Order and Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order upon counsel for Defendant as follows:

**By Hand Delivery:**

United States Attorney
United States Attorney's Office
     for the District of Columbia
555 4th Street, N.W.
Washington, DC  20530


The Honorable R. James Nicholson
Secretary of Veterans Affairs
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420


**By Prepaid First Class U.S. Mail:**

Attorney General of the United States
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


                    /s/ Terence P. Ross
                    Terence P. Ross


ROSS- Certificate of Service.doc

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BRENDAN S. ROSS, M.D.,                    )
                                          )
        Plaintiff,                 )
                                          )
v.                                        )    Civil Action No. 07-1163 (JDB)
                                          )
DEPARTMENT OF VETERANS AFFAIRS,           )
                                          )
        Defendant.                 )
                                          )

## DECLARATION OF BRENDAN S. ROSS

I, Brendan S. Ross, do hereby state and, if called as a witness in this matter, would testify:

1.      I am a medical doctor and a citizen of the United States. I received my medical degree from the University of Virginia School of Medicine in 1988. After residency training at Brown University and the Medical College of Georgia, I was board certified in internal medicine in 1991. I received post-graduate training in Clinical Effectiveness at Harvard University's School of Public Health. I have been accorded practice privileges at seventeen (17) different hospitals in five (5) states in my career and have never previously had my practice privileges reduced or rescinded. Moreover, I am a medical researcher as well as a clinician. I have taught internal medicine and pharmacology at the University of South Alabama School of Medicine and at the University of Mississippi School of Medicine. I have published more than a dozen articles in peer-reviewed medical journals and have spoken at more than one hundred (100) medical conferences. I am licensed to practice medicine in the Commonwealth of Virginia, the State of Alabama, and the State of Mississippi and I am currently in good standing in each of those states.

2.    I began work at the Medical Center on or about July 2, 2000. Since then, I have worked as a primary care physician at the Medical Center continuously to the present time. I am a "tenured" VA physician under 38 U.S.C. § 7401(1).

3.    The outpatient medical care of neuro-psychiatrically impaired patients is so unique and so demanding that the Medical Center decided to establish a special medical clinic to be run by an expert in providing primary medical care to such patients. The Medical Center called this special clinic, the "Silver Clinic." It was an innovative approach to the medical care of neuro-psychiatrically impaired veterans in a number of ways. The Silver Clinic, unlike other outpatient medical clinics, was to be administratively placed under and physically co-located within the Medical Center's Psychiatric Services, making it easy for patients to obtain coordinated psychiatric and medical care. And, by retaining a medical director for the Silver Clinic who had special expertise, neuro-psychiatrically impaired patients would receive improved medical care. Moreover, by concentrating all such patients at the Medical Center in one clinic, it necessarily changed the composition of all other primary care clinics, improving the efficiency with which medical care was provided for veterans who were not neuro-psychiatrically impaired.

4.    Once the Silver Clinic was established, its patient cohort consisted entirely of veterans who were neuro-psychiatrically impaired. Most of these patients were also on multiple psychotropic medications. The Silver Clinic was administratively placed under and physically co-located within the Medical Center's Psychiatric Services. The Silver Clinic provided only outpatient medical care; it did not provide psychiatric care.

5.    I was hired to serve as the Medical Director of this innovative primary care clinic. I was the only physician assigned to the Silver Clinic. I was assisted by three nurse practitioners.

It was represented to me by the Administration of the Medical Center at the time I was hired that

the patient panel for which I would serve as primary care provider at the Silver Clinic would be

between 600 and 800 active patients and that the time allotted for each medical encounter or

patient visit would be no less than thirty (30) minutes. These representations were true at the

outset.

6.    The first years of this innovative effort at addressing the special medical needs of

neuro-psychiatrically impaired veterans indicated that this approach held great promise. In late

2002 - early 2003, however, the Administration of the Medical Center made a dramatic change

in the Silver Clinic. The Administration of the Medical Center realized that it could not bill

Medicare or private insurers for my services as long as the Silver Clinic was within Psychiatric

Services. It could bill for my services if the Silver Clinic was not within Psychiatric Services. In

order to maximize insurance revenue and in complete disregard for patient care, the Director of

the Medical Center ordered the Silver Clinic to be placed within the Medical Service

administered by Nursing Services (which had administrative purview over the other primary care

clinics), cut its staff, reduced my time to see patients to twenty (20) minutes and physically

relocated it to less advantageous clinic space within the Medical Center, thereby adversely

changing its connection with patients it served and Psychiatric Services.

7.    I was concerned that this change would have an adverse impact on the quality of

patient care. As my concerns became realized, I reported to my supervisors and the

Administration of the Medical Center these concerns about patient care. In particular, I reported

that my clinic should be supervised by a physician, preferably a psychiatrist, not a nurse lacking

in any specialized training in psychiatry. I also reported that the ratio of patients to provider and

ancillary personnel was inappropriate to meet quality care standards. I also reported that the

examination rooms in the clinic were poorly equipped. Of particular importance, however, was the fact that, once the Silver Clinic was brought into line with the other primary care clinics by the order of Nursing Services, I was only permitted to spend twenty (20) minutes on each patient encounter, rather than the thirty (30) – forty (40) minutes permitted when under the purview of Psychiatric Services. These and other concerns about patient care were ignored by the Administration of the Medical Center.

      8.    My continued complaints about patient care and efforts to obtain extramural scrutiny of the quality of outpatient medical care at the Medical Center, led Mr. Baltz and the Administration to target me for separation from the Medical Center. In or about 2005, the Administration again relocated me within the Medical Center. As part of this action, the Administration disclaimed that it would any longer pursue the innovative approach of concentrating all neuro-psychiatrically impaired patients in a single clinic for outpatient medical service. The Administration, however, did not make any changes in the patient cohort assigned to my practice in the Blue I Clinic: it still consisted of all of the neuro-psychiatrically impaired patients seeking medical care at the Medical Center. Moreover, the Administration doubled the size of the patient panel for which I would be the primary care provider from approximately 600 active patients to approximately 1200 active patients with no increase in support. The intent of these changes was to create the impression that my clinic was less efficient than other outpatient medical clinics within the Medical Center and that I accrued more patient complaints, notwithstanding that no comparison of my clinic with the other clinics is possible given the *sui generis* nature of my clinic's patient cohort. In short, the Administration was setting me up for failure. Moreover, it knew that I would recognize this and hoped that I would voluntarily resign from the VA.

9.      As part of its efforts to drive me out of the Medical Center, the Administration

initiated a series of petty disciplinary actions against me. My superiors misapplied leave policy

as set forth in the Medical Center's Labor-Management Agreement. They demanded that notice

of leave be provided ninety (90) days in advance, a policy applicable only to clinic scheduling

changes. My efforts to comply with this illegitimate mandate led to additional job stress, and

when I attempted to secure an emergency leave, I was charged with failing to follow the leave

policy. When I protested this clear violation of the Labor-Management Agreement, disciplinary

action was brought against me. The Administration also began to enforce staff bylaws requiring

medical encounter notes be recorded during the course of each patient examination thereby

limiting face-to-face patient care time even further. This bylaw had never previously been

strictly enforced. Yet, when I seemingly failed to comply strictly with it, disciplinary action was

brought against me.

10.     In the Summer or early Fall of 2006, Mr. Baltz realized that I was not going to

resign voluntarily from the VA. Accordingly, by memorandum dated September 11, 2006, he

established a three-member Administrative Board of Investigation ("AIB") to investigate

allegations of "inappropriate conduct/communication" by me allegedly based on "complaints of

patients, families, and staff." A true and correct copy of this memorandum is appended hereto at

Tab 1. In fact, however, no such complaints had been filed. Significantly, the AIB was not

charged with investigating my patient care. Indeed, because of the fact that no physician who

practiced internal medicine was appointed to the AIB, it would have been impossible for the AIB

to evaluate any issue of patient care. I was not notified of the initiation of this investigation.

11.     On or about November 7, 2006, I received a telephone call from the Chairperson

of the AIB, Ms. Tricia Mathias, a nutritionist employed by the Medical Center. Ms. Mathias

requested that I appear before a three-person panel for an "interview." Ms. Mathias did not tell

me that I was the subject of an investigation. This is the first time that I became aware of the

existence of any inquiry. I advised Ms. Mathias that she should direct any such request to my

legal counsel. My legal counsel immediately contacted Ms. Mathias and asked for the basis of

her authority, the subject matter of the investigation, the identities of the members of the AIB,

the identity of any witnesses and the substance of their testimony. In a subsequent telephone

call, Ms. Mathias declined to provide any of this information, but conceded that I was the subject

and that witnesses were giving testimony under oath that was being recorded stenographically,

despite her characterization of these contacts as merely "interviews." My counsel made a formal

request for this information to Ms. Mathias by letter dated November 24, 2006. A true and

correct copy of this letter is appended hereto at Tab 2. By letter dated December 24, 2006, the

Director of the Medical Center, not Ms. Mathias, responded to this request by providing a copy

of the September 11, 2006 memorandum establishing the AIB and a copy of VHA Handbook

0700. This letter reiterated that the purpose of the investigation was exclusively limited to

"allegations of . . . inappropriate conduct/communications." A true and correct copy of this letter

is appended hereto at Tab 3.

12.    By memorandum dated January 17, 2007, Ms. Mathias issued to me a "Direct

Order to Give Testimony" under threat of discipline if refused. That memorandum stated that I

had "no 'due process' rights to advance notice, or to notice of charges, nor do you have the right

to review or challenge adverse evidence." A true and correct copy of this memorandum is

appended hereto at Tab 4. I informed Ms. Mathias that I could not be available on the date set

for my appearance, but would arrange a subsequent date.

13.     On January 30, 2007, I was confronted in my clinic by the Acting Chief of Police of the Medical Center. I was issued a memorandum from Mr. Baltz ordering that I be placed on administrative leave and that I be escorted off the premises of the Medical Center. That memorandum stated: "you are ordered not to have any further communication with any medical center employee during the period of inquiry into this matter." A true and correct copy of that memorandum is appended hereto at Tab 5. I was not allowed to remove any of my personal belongings from the clinic or my personal records electronically stored on the Medical Center's computer network. The police then paraded me through the common areas of the Medical Center in front of my waiting patients and staff, making great show of removing me from the premises.

14.     I appeared before the AIB on February 12 and 13, 2007. My testimony was taken under oath and stenographically recorded. Although I was allowed to have counsel present, my counsel was not allowed to participate in the proceeding. At no point during the proceeding was I apprised of the nature of the charges against me, the substance of the alleged complaints about me or the identities of the patients who had purportedly lodged the complaints. I was allowed to present a statement to the AIB. In that statement, I made clear that I believed I had been targeted by Mr. Baltz for termination due to my reports to supervisors regarding the poor quality of outpatient medical care being provided to neuro-psychiatrically impaired veterans at the Medical Center.

15.     Within days of making these critical comments about Mr. Baltz and the quality of patient care at the Medical Center, Mr. Baltz by letter dated February 22, 2007, personally and summarily suspended my clinical privileges at the Medical Center. A true and correct copy of that letter is appended hereto at Tab 6. Mr. Baltz took this action without warning or notice, let

alone consultation with my medical supervisors, and without first attempting other remedial options. Mr. Baltz clearly took this action in retribution for my criticism of him before the AIB. Indeed, Mr. Baltz is not a medical doctor and, therefore, in no position to evaluate my fitness to practice at the Medical Center. This action was taken without reference to or recommendation from the Chief of Staff or Executive Committee of the Medical Center and without providing the reason(s) for the change in privileges, all of which is required by VHA Handbook 1100.19. Mr. Baltz's letter also seemed for the first time to expand the scope of investigation into "patient safety concerns," even though no such charge was ever given to the AIB. The letter also stated that if the investigation resulted in a reduction or revocation of privileges, "a report will be filed with the NPDB with a copy to the appropriate State Licensing Board in all states in which you currently hold a license . . . ." On March 5, 2007, I requested the disclosure of the basis for the suspension of my clinical privileges. A true and correct copy of this letter is appended hereto at Tab 7. To this day, no response has ever been given to this request, suggesting that there was no legitimate basis for Mr. Baltz's action.

16.    On June 5, 2007, a "Proposed Discharge Memorandum" was issued by the Chief of Medical Services of the Medical Center, Dr. Stephen A. Geraci. Appended to this Memorandum and in support of my proposed discharge, was a second memorandum, dated May 25, 2007, and simply captioned "Douglas Factors." Dr. Geraci was not a member of the AIB nor did he participate in the investigation. Moreover, Dr. Geraci did not review the evidence collected by the AIB and did not prepare either memoranda. Indeed, at the time I was placed on administrative leave, Dr. Geraci told me that he had not been called to testify by the AIB and that "he was unaware of any issue of professional conduct or competence that warranted such action"

against me.  He simply signed each memoranda as a ministerial matter, apparently at the direction of Mr. Baltz.  A true and correct copy of those memoranda is appended hereto at Tab 8.

17.    On June 7, 2007, I advised Dr. Geraci in writing of a number of factual errors in the Douglas Factors Memorandum relating to the records maintained by the VA about me.  A true and correct copy of this letter is appended hereto at Tab 9.  In reply, Dr. Geraci stated that this matter was being  handled by the Director personally and my request would be transmitted to Mr. Baltz.  A true and correct copy of this letter is appended hereto at Tab 10.  To this day, I have not received a response.

18.    The Proposed Discharge Memorandum was served upon me on June 6, 2007.  It stated that I had a mere fourteen (14) calendar days to respond to the evidence developed by the AIB during its almost nine-month investigation.  It also advised me that the final decision on discharge would be made by Mr. Baltz despite his obvious bias against me and lack of qualifications to judge appropriate patient care.  It also stated that "[i]f it is the decision of the Center Director that you be discharged, your discharge will be effective not less than 30 calendar days from the day after the receipt of this notice."  In other words, the discharge could be effective long before any administrative or judicial review of the discharge could be obtained by me.  It also stated that, if I am terminated, the VA, pursuant to its policy, will report me to the state licensing board.  This would result in the loss of my license to practice medicine and my being unable to pursue the profession in which I have invested more than twenty-five (25) years of education and training to become a specialist in internal medicine.  Again, this would happen long before I could obtain any administrative or judicial review.

19.    The Proposed Discharge Memorandum also stated that I would be provided with "[t]he evidence on which this notice of proposed action is based . . . ."  This evidence was not

provided to me until late on June 8, 2007, further shortening my time to reply to the false charges made against him. Moreover, when this "evidence" was provided, it constituted approximately two thousand (2,000) pages of documents and transcripts from the almost nine-month long AIB investigation, requiring more than a week for me to review.

20.    Review of the AIB "evidence" revealed that I was not provided with certain significant information. For example, and without limitation, the names and contact information of patients whose hearsay statements were used against me were not provided, thus denying me the opportunity to contact them to obtain affidavits in support of my position. In addition, I was not provided with the records of patients, staff or employees contacted by the AIB, but whose testimony was not taken because it was favorable to me.

21.    Of particular significance, because I was barred from the Medical Center premises, I could not consult the medical records, including my patient encounter notes, maintained exclusively in electronic form on the Medical Center's computer network. This information is critical to my ability to respond to the false charges brought against me by the AIB because all but one of the these charges relate to patient medical care. By letter dated June 6, 2007, I requested access to these medical records. A true and correct copy of this letter is appended hereto at Tab 11. By letter dated June 7, 2007, Mr. Baltz denied access to these records. A true and correct copy of this letter is appended hereto at Tab 12.

22.    In preparation for the hearing before Mr. Baltz, I requested in writing that I be allowed to make my presentation using PowerPoint. I also requested in writing that the hearing be set for two (2) days in order to have sufficient time to explain to Mr. Baltz why the charges are inaccurate. A true and correct copy of this letter is appended hereto at Tab 13. By letter dated June 7, 2007, Mr. Baltz denied these requests. A true and correct copy of this letter is

appended hereto at Tab 14. The date for Mr. Baltz to meet with me and decide upon the proposed discharge was set for July 10, 2007.

23.    By letter dated June 26, 2007, I requested that Mr. Baltz agree to suspend the effective date of any discharge pending a review of such decision. A true and correct copy of this letter is appended hereto at Tab 15. Mr. Baltz has never replied to this request.

24.    In my almost seven (7) years working as a physician at the Medical Center, I have been the primary treating physician for more than 3,500 different patients. I have had more than 30,000 patient encounters -- instances in which I examined and/or treated a patient either by appointment or urgent care visit. During that time, no patient ever complained about harm or adverse medical consequence as a result of my lack of competence, prior to the initiation of this investigation. I expressly asked the AIB to disclose any such instance, but they failed to do so.

25.    I have never received an unsatisfactory proficiency rating in any of my annual reviews at the Medical Center. I have never received any written counseling from my line supervisors in regard to deficient medical practices or VA regulation adherence. I have never been ordered to attend remedial education or training. Indeed, my Official Personnel File contains no reports of tardiness, disruption of clinic procedures, complaints from nurses or staff about unprofessional conduct, falsification of records or any of the other practices with which I am now charged.

26.    In more than eighteen (18) years of medical practice and more than 75,000 patient contacts, no patient has ever complained about harm or adverse medical consequence as a result of my lack of competence or due to poor quality of medical care received. No report about me has ever been made to the NPDB. No complaint has ever been filed against me with any state

medical licensure board or physician review board. Moreover, I have never been sued for negligent medical care.

27. Despite vigorous efforts by the Director and Administration of the Medical Center to uncover dissatisfied patients, including the outrageous practice of "cold-calling" large numbers of my patients to encourage them to complain about me, only ten (10) patients could be found who, after improper prodding and leading questions by AIB members, seemed to recollect an unsatisfactory experience with me. Each of these ten (10) patients have serious neurologic or psychiatric conditions requiring the attention of mental health specialists and/or the use of psychotropic drugs. Moreover, each of the alleged complaints (if they could even be called that) happened long before the testimony before the AIB -- including one incident that had occurred three years previously. I have never been allowed to confront or cross-examine any of these witnesses.

28. As a result of the VA's actions, I have suffered and will continue to suffer irreparable harm to my reputation; deprivation of my constitutionally protected liberty and property interests (my right to practice my profession of medicine); and a deprivation of my constitutionally protected due process rights. In addition, I will be deprived of the great satisfaction I derive from practicing medicine and helping patients.

29. I have no adequate remedy at law.

30. Absent injunctive relief, I will continue to suffer irreparable harm by the VA's actions. Indeed, even if I later am cleared of these false charges, the stigma of a discharge for these reasons will hang over me like a cloud for the remainder of my career. Whenever I apply for a new position, I will be asked about the gap in my *curriculum vitae*.

31.    On or about June 6, 2007, I learned of certain factual inaccuracies in the records maintained by the VA about me. For example and not by way of limitation, a May 25, 2007 memorandum states: "At no time did I convey to service leadership any issues which could be considered mitigating to these behaviors . . . ." This is incorrect. On April 8, 2005, I notified the Chief of Staff of the Medical Center and the Chief of Medical Service in writing that I had been subjected to unusual job stress and needed to obtain counseling for my "failure to adequately cope with and appropriately respond to work stressors." I subsequently reported in writing that I had to take short-term medication therapy in addition to counseling for this problem. A true and correct copy of these notifications are appended hereto at Tab 16.

32.    On June 7, 2007, I notified Dr. Geraci in writing of these inaccuracies and requested an amendment of the records maintained by the VA. A true and correct copy of this letter is appended hereto at Tab 9. Dr. Geraci acknowledged receipt of this request for an amendment on June 8, 2007. A true and correct copy of this letter is appended hereto at Tab 10. The VA did not "promptly" make the requested corrections nor did it inform me of its refusal to amend, the reasons therefore and procedures for review of its decision. To this day, the VA has neither corrected my records nor refused to do so.

33.    The failure of the VA to maintain accurate records of me is particularly egregious because that inaccurate record has been and is being used against me to make a determination which is adverse to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2007

Brendan S. Ross

# TAB 1

06/26/07  TUE 12:45 FAX 601 984 2751      CLIN PHARMACY PRACTICE                                   ☒003

ATTACHMENT #1

**Department of**
**Veterans Affairs**

# Memorandum

**Date:**   September 11, 2006

**From:**   Center Director (00)

**Subj:**   Administrative Board of Investigation – Alleged Inappropriate Staff Conduct/Communication

**To:**   Tricia Mathias, Nutrition & Food Service (120)

1. You are hereby appointed Chairperson and Recorder of an Administrative Board of Investigation to conduct a thorough investigation into the facts and circumstances regarding allegations of Dr. Brendan Ross' inappropriate conduct/communication according to complaints of patients, families, and staff. The following individuals will serve as members of the board:

> Anthony Beasley, Chaplain Service
> Dr. James Brister, Mental Health Service

2. Your investigation should include:
   - interviews with patients and families -- Does conduct/communication with patients meet criteria of verbal patient abuse?
   - interviews with staff, including clinic staff, supervisors, and patient representatives
   - consultation with Senior Patient Representative regarding number of complaints per provider

3. This memorandum authorizes you to investigate all aspects of this issue; to require all VA employees to cooperate with you; to require employees having any knowledge of the complaint to furnish testimony under oath or affirmation without a pledge of confidentiality; to obtain voluntary sworn testimony from other individuals; to administer oaths and affirmations; and to gather other evidence that you determine is necessary and relevant. These authorities are delegated for the purposes and duration of this investigation only. Your investigation shall be conducted and reported in accordance with VA Directive 0700 and VA Handbook 0700 (Administrative Investigations). Ms. Gloria Matory, Office of Quality Management, will provide team training prior to initiation of investigation. She may be reached at extension 5497 or 1219 to arrange training.

4. Witnesses furnishing information considered to be pertinent must be placed under oath by an employee duly authorized to administer oaths. Pursuant to VA regulations, I am hereby delegating you authority to administer oaths as required for this investigation. The attached VA Form 4505 officially prescribes this delegation. Please return this card with your final report.

5. Please convene your board as soon as possible in order to obtain current information. Please submit your completed report and investigative file to me within 21 days of this memorandum's date (October 2, 2006) unless an extension is granted. Please do not make copies of any of the reports, materials, or other documents provided as attachments or support to the report.

Page 2

Tricia Mathias, Nutrition & Food Service (12)

6. Please feel free to contact my office or the Chief of Staff for any further assistance needed.

Richard J. Baltz

Attachments

cc:
Board Members
President, NFFE
Gloria Matory (11Q)

# TAB 2

24 November 2006

Tricia Mathias, M.S.
Chief, Nutrition and Food Service
G.V. (Sonny) Montgomery VAMC
Jackson, MS 39211

Re: Board of Inquiry

Dear Ms. Mathias:

I am writing in follow-up of our recent telephonic discussion regarding my client Pursuant to my legal representation of Dr. Brendan S. Ross, please advise me as to the procedures for obtaining VHA patient record data for our review.

As you have informed me, the Administrative Board investigating Dr. Ross is focusing on his patient care interactions. To diligently represent his interests, I will need access to individually identifiable patient information, the status of which is otherwise protected. However, as this health information is occasioned by your administrative inquiry, such disclosure is relevant and necessary.

To narrow our preparation for Dr. Ross's appearance before the Board, it would, again, be helpful to have access to the primary patient complaint(s) that generated your probe.

Respectfully Submitted,


John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

Cc: Brendan S. Ross, M.D.,
 Joseph Simon C. Simon, President NFFE Local 589

# TAB 3



**G.V. (SONNY) MONTGOMERY**
**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
**1500 East Woodrow Wilson Drive**
**Jackson MS 39216**

December 26, 2006

In Reply Refer To:

John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

### Subject: *Board of Inquiry*

1. Your letter to Ms. Tricia Mathias dated November 24, 2006, has been referred to my office for response.

2. I appointed Ms. Mathias Chairperson and Recorder, in memorandum dated September 11, 2006 (*copy attached*), for the Administrative Board of Investigation to conduct a thorough investigation into the facts and circumstances regarding allegations of Dr. Brendan Ross' inappropriate conduct/communications as reported in complaints of patients, families, and staff.

3. Administrative Board of Investigations are conducted and reported in accordance with VA Directive 0700 and VA Handbook 0700 (*Administrative Investigations*) (*copy attached*).

4. Please note, VA Regulation 38 CFR 0.735-12(b) states, "*Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be grounds for disciplinary action. An employee, however, will not be required to give testimony against himself or herself in any matter in which there is a possibility of self-incrimination*" (*emphasis added*). In addition, VA Directive 0700 requires all employees to cooperate with administrative investigations to the extent permitted by governing laws, regulations, policies, and collective bargaining agreements.

5. In addition, VA Directive 0700 requires that a witness giving testimony to a Board of Investigation refrain from disclosing any information developed in the course of the investigation, including the substance of their testimony. This is to protect the integrity and fairness of the investigative process. As the Board has not completed their investigation at this point, your request for copies of testimony or depositions must be declined at this time.

*Page 2*

*Board of Inquiry*

6. This office is committed to ensuring that the integrity and fairness of the investigative process remains intact.

*[signature]*
Richard J. Baltz

cc:  Joseph Simon, President, NFFE, Local 589
     Dr. Brendan Ross, Medical Service (111)

Attachments (3)

# TAB 4

# Department of
# Veterans Affairs

# Memorandum

Date: January 17, 2007

From: Chairperson, Administrative Board of Investigation

Subj: **Direct Order to Give Testimony**

To: Dr. Brendan Ross
Medical Service (111)

*(Rec'd in person same date)*

*Rec'd back Jan 18 mailed*

1.  You are hereby directed to report to the Neurology Conference Room (Room K-206) at 9:00 a.m. on January 26, 2007, to give testimony to the Administrative Board of Investigation charged with investigating the facts and circumstances regarding allegations of your inappropriate conduct/communication with patients, families and staff.

2. Please be advised that federal law provides certain *"due process"* rights to persons in proceedings where important personal interests such as property or liberty are at stake. Because administrative investigation boards are investigative bodies and do not determine such interests, such rights are inapplicable to administrative investigations. Therefore, you have no *"due process"* right to advance notice, or to a notice of charges, nor do you have the right to review or to challenge adverse evidence. If adjudication proceedings, such as disciplinary proceedings and appeals, are initiated as a result of an administrative investigation, any applicable due process rights would attach to those proceedings.

3. In addition, under title 38 USC 7422 (b), the collective bargaining rights of Title 38 employees are not applicable to matters involving (1) professional conduct or competence (i.e., direct patient care or clinical competency) (2) peer review, or (3) certain pay matters. VA's position is that Title 38 employees have no statutory right to assistance of union representatives at investigative interviews involving these typesof matters. However, representation will be permitted as a matter of discretion but the unavailability of your designated representative will not delay or warrant the rescheduling of the above stated date and time.

*Page 2*
*Direct Order to Give Testimony (Dr. Ross)*

4. 38 C.F.R. 0.735-12(b) states:  Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters.  Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation may be grounds for disciplinary action.  Your failure to appear on the scheduled date and time may result in disciplinary or adverse action which may affect your employment at this facility.

*Tricia Mathias*

Tricia Mathias

cc:  Joseph Simon, President, NFFE, Local 589

 John J. Ross, III, Esq.
 7021 Marlan Drive
 Alexandria, VA  22307

 Chief, Medical Service (111)

# TAB 5

# Department of
# Veterans Affairs

# Memorandum

Date: January 29, 2007

From: Center Director (00)

*Rec'd: 2/6/07*

Subj: **Direct Order for Administrative Absence**

To: Dr. Brendan Ross
Medical Service (111)

*Mailed Jan 31*

1. This is to advise you that effective immediately, you will be carried in an excused absence (*administrative leave*) status, without loss of pay or charge to leave, pending inquiry into issues of concern resulting from the pending administrative board of investigation.

2. During the period of inquiry, you are directed to remain off VA Medical Center property without advance approval. In addition, you are ordered not to have any further communication with any medical center employee during the period of inquiry into this matter. If you have a need to make contact or return for any reason such as a medical appointment or to speak with a union or EEO representative, you must contact the acting Chief, Police Service, Jesse Lumpkins, (601) 362-4471 extension 5750, to request permission and obtain approval in advance. Chief Lumpkins will coordinate your visit and arrange for an escort to and from your scheduled appointment. Any arrangements for meeting on VA property will be subject to clearance by the Acting Chief, Police Service in advance.

3. As a VA employee, your full cooperation is both expected and required with any official inquiry to bring it to closure as soon as possible. You have not been charged with any offense or act of misconduct. This is simply an administrative determination that the best interest of the VA is served by this order at this time.

4. You will be notified by your service chief of the results of the inquiry and when you will be again allowed to enter medical center property.

Richard J. Baltz

cc: President, NFFE, Local 589
Chief, Medical Service (111)
Acting Chief, Police Service (07B)

John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

VA FORM
MAR 1989 **2105**

I acknowledge receipt of the original memorandum:

Signature: _____   Date: 1-30-07

# TAB 6



**DEPARTMENT OF VETERANS AFFAIRS**
**G. V. (SONNY) MONTGOMERY**
**Medical Center**
**1500 E. Woodrow Wilson Blvd.**
**Jackson, Mississippi 39216-5199**

February 22, 2007

In Reply Refer To:  586/00

• Brendan S. Ross, M.D.
  231 Winged Foot Circle
  Jackson, MS 39211-2530

Dear Dr. Ross:

This letter serves as written notification of summary suspension of all clinical privileges held by you at the G. V. Sonny Montgomery VAMC pending full investigation of conduct/communication and patient safety concerns.

A summary suspension pending comprehensive review and due process is not reportable to the National Practitioner Data Bank (NPDB). Please be advised that if a reduction or revocation of privileges is effected based on the outcome of proceedings, a report will be filed with the NPDB with a copy to the appropriate State Licensing Board in all states in which you currently hold a license as well as the state of Mississippi.

Should our investigation result in a proposal to reduce or revoke your privileges, due process is outlined in VHA Handbook 1100.19 and contains your rights. The section on reduction and revocation of privileges is attached.

Sincerely yours,

Richard J. Baltz
Center Director

Enclosures:

VHA Handbook 1100.19

cc:
Chief of Staff

# TAB 7

5 March 2007

Richard J. Baltz
Center Director
G.V. (Sonny) Montgomery VAMC
Jackson, MS 39216

Dear Mr. Baltz:

I am in receipt of a memorandum of 29 January 2007 identified as a Direct Order for Administrative Absence and a letter of 22 February 2007 that provides notice of a "summary suspension of all clinical privileges," both of which you issued to Dr. Brendan S. Ross. I have advised my client that your actions breach the collective bargaining agreement, and he has directed me to seek redress.

You should be aware that the Labor-Management Agreement between the Department of Veterans Affairs and the Council of Veterans Administration Locals, National Federation of Federal Employees is the "Master Agreement" between these parties and that "To the extent that directives within the discretion of VA management may be in conflict with this agreement, the provisions of the agreement will govern" (Part B, Article 8, Section 1). Your memorandum and letter intimate that Dr. Ross's performance has been judged to be lacking by his supervisors. However, at the time he was presented the memorandum, his line supervisor, the Chief of the Medical Service, stated that he was unaware of any deficiencies that would lead to such an order. My contemporaneous notes of a telephone conversation with the Chief of Staff on 30 January indicate that he was able to provide my client an "unqualified" letter of recommendation when Dr. Ross seeks alternate employment.

As the Labor-Management Agreement puts it succinctly: "It is the basic function of a supervisor to identify poor job performance and to take corrective action" (Part B, Article 17, Section 2, Paragraph B). Your actions detrimental to my client's employee status and professional reputation thus seem unjustified, in that Dr. Ross's two immediate supervisors have not adversely judged his performance. Indeed, if they held such an opinion, they would have been compelled to counsel my client under the mandates of the proficiency ratings system.

*When performance problems are observed which might be expected to result in an unsatisfactory annual proficiency rating, the rating official will hold a counseling conference with the employee sufficiently in advance of the due date of the annual report to give the employee a reasonable opportunity to correct identified deficiencies and to demonstrate satisfactory performance. During the conference, the rating official will tell the employee of the time, normally 60 to 90 days, which will be allowed for improvement in performance* (Part B, Article 15, Section 6).

My client informs me that deficiencies in his performance have not been so identified, that he has not had such counseling, and that at no time has any rating official issued him a signed and dated "document indicating [any]…performance deficiencies and suggested solutions, and the time allowed for improvement," as mandated by the Labor-Management Agreement.

Proficiency ratings are held by the VA to "Provide a basis for improving the effectiveness of personnel by indicating needs for training and development" (VHA MP-5, Part II, Chapter 6.04 (6)). If an employee demonstrates "inadequate proficiency or weak performance, [then the] employee will normally be counseled and given the opportunity to improve" (6.05 (h) 4). Dr. Ross reports that analyses by his supervisors have never led to him being detailed for professional development to correct specific deficiencies or to enhance his overall effectiveness. Moreover, he would have welcomed such constructive assessments and would have fully complied with any recommended remediation. As the

"Facility Director is responsible for proper functioning of the proficiency rating system," we must hold you responsible for any lack in its implementation, or if it was misused to bolster potential disciplinary charges against my client (6.05 (a)).

As an attorney specializing in Labor Law, I am well acquainted with the need for good relations between employees and administrators. The public interest demands the highest standards of performance from VA health care providers. But the efficient administration of this Federal program is also a public trust. As a right of employment, VA employees must be allowed to "Express themselves concerning improvement of work methods and working conditions" (Part B, Article 3, Section 18, Paragraph C). And in exercising these rights, they "will be free from restraint, coercion, discrimination, or reprisal" by administrators (Part B, Article 6, Section 4). Dr. Ross has repeatedly expressed concern over the staff organization, working conditions, patient scheduling, and administrative supervision of outpatient care at your medical center. It is apparent that your recent orders continue a pattern of personal bias against my client for his expressions of doubt in your oversight of these vital services.

This is not the first time you or your delegates have violated the Labor-Management Agreement in my client's regard. In a Reprimand of 6 February 2004, a Suspension Decision of 20 September 2004, and a Discharge Decision-Abeyance Agreement of 9 August 2005 a standard for notice of leave was applied, which is in direct contravention to that delineated in the Master Agreement (See Part B, Article 13, Sections 1.D and 3.D). More egregiously, in the so-called Abeyance Agreement, your delegate, Ms. Rebecca J. Wiley, sustained charges against my client that alleged Violations of VA Information Security Policy and the Privacy Act of 1974 that involved my representation, for which I submitted a sworn affidavit exonerating Dr. Ross. Those breaches and your current actions abrogate management's agreement only to take action against employees "for just cause," where the intent is "primarily to correct and improve employee behavior, rather than to punish" (Part B Article 16, Section1).

Your inattention to VA rules, regulations, and policies, and overt hostility toward my client's due process rights is evident in your oversight of the Administrative Board of Investigation (ABI), which you convened 11 September 2006. I was present on the twelfth and thirteenth of February during my client's testimony. Dr. Ross reviewed his clinical practices in a 3 hour long morning session and was questioned concerning multiple allegations in an afternoon session and an additional morning session the following day. I was surprised to find that the Board members seemed unaware of the provisions detailed in VA Handbook 0700, as they never focused on collecting and assembling relevant evidence: the nature and sequence of the events alleged. Indeed, at no time did they present my client with eyewitness testimony regarding a specific incident of alleged "inappropriate conduct/communication" in terms of date, time and place. Furthermore, even after Dr. Ross directly confronted the Board members, none stated that any harm or adverse consequence had followed as causally related to these allegations or any other instances. The Board members seemed fixated on "witness opinions, characterizations and conclusions" that the governing document holds "are rarely helpful as evidence," while seeming to ignore gathering facts that would "reliably and effectively show what happened" (Handbook 0700, Appendix D).

At this time, I request that you fully disclose the materials you reviewed to justify the order you issued on 29 January and the action you took on 22 February. If this evidence has been developed by the ABI, then I request that you permit my client to address these issues, as VA Handbook 0700 demands that such Board's "Must collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations.." (Chapter 4, Section B, Paragraph 2). Furthermore, I request that you show how the use of your administrative powers has not violated the Labor-Management Agreement nor evinced a personal bias against my client.

2

As per the grievance procedures delineated in Article 6 of the Labor-Management Agreement, my client hereby lodges a formal complaint regarding your failure to adhere to the prescribed proficiency rating system and requests a meeting with the appropriate authority to resolve this personnel dispute.

Respectfully submitted,


John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

Cc: Joseph Simon, R.Ph., President, NFFE Local 589;
Walternet Gardner, Office Resolution Management;
Robert Lynch, M.D., Network Director VISN 16

3

# TAB 8

# DOUGLAS FACTORS

**Employee's Name:**   **Brendan S. Ross, M.D.**

**Type of Action:**    **Discharge**

**Factors:**

**a.  The nature and seriousness of the offense and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional, technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated:**
The nature and seriousness of the offenses Dr. Ross is charged with are severe in that his conduct caused a breach of trust that harms the patients, their families and the agency. The pattern of behavior as well as the frequency and volume of complaints impede the efficiency of the service.  Patients are placed in clear and imminent danger by falsification of records, including reports of examinations which were never performed.

**b.  The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position:**
Dr. Ross is a full-time permanent staff physician who has regular daily contact with patients, family members and staff in a busy primary care clinic.  He interacted with a minimum of 20 patients per day.

**c.  Employee's past disciplinary record:**
Dr. Ross received a 7-day suspension on 09-20-2004, for unauthorized absence; failure to follow proper leave requesting procedures and failure to provide appropriate and accurate documentation of medical care provided.

**d.  The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers and dependability:**
Dr. Ross has been a staff physician at this facility since July 2, 2000.  He has a high volume of patient complaints, and is regularly and consistently late for patient appointments, creating backlog and disruption in his assigned clinic.

**e. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties:**
Dr. Ross' conduct is clearly intentional.  Failure to do exams as documented in the medical record place patients at physical risk of undiagnosed disease, endangering patient safety with each occurrence.  As such acts could not have been performed accidentally; there is no confidence that such acts would not be repeated whenever the opportunity was presented.  Nursing staff have made verbal complaints on several occasions of Dr. Ross' insulting them and speaking to them in a loud and abusive voice.



*Page 2*
*Douglas Factors – Dr. Brendan S. Ross (Discharge)*

**f.  The consistency of the penalty imposed in this case with those imposed upon other employees for the same or similar offenses and with the agency's applicable table of penalties:**
The penalty imposed is consistent with those recommended penalties outlined in the VA Table of Penalties.

**g.  The notoriety of the offense or its impact upon the reputation of the agency:**
Dr. Ross' quality of care, or lack thereof, is well known throughout his veteran patient panel and staff at this medical center. His unprofessional and potentially dangerous behavior toward veterans lowers confidence of veterans in the care provided at the Jackson VAMC and increases the agency liability for medical malpractice lawsuits.

**h.  The clarity with which the employee was on notice of any rules which were violated in committing the offense:**
Physicians have an affirmative obligation to maintain the integrity, accuracy, truth and reliability of patient medical records. The offenses cited are so contrary to the basic tenets of customary care that no health care provider could argue that the behaviors could ever be acceptable.

**i:  Employee's potential for rehabilitation:**
None. Intentional falsification of medical records to avoid accusations of negligence would not be remediated by any rehabilitative process.

**j:  Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter:**
None evidenced. At no time did Dr. Ross convey to service leadership any issues which could be considered mitigating to these behaviors.



*Page 3*
*Douglas Factors — Dr. Brendan S. Ross (Discharge)*

    **k: The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others:**
None. The conduct presents a clear and imminent danger to patients.


*Stephen A. Geraci, MD*      May 25, 2007
Stephen A. Geraci, M.D.             Date Signed
**Chief, Medical Service**
**Name and Title of Proposing Official**



**I have reviewed and considered the relevant factors s described above. In consideration of the above factors, any mitigating circumstances and the employee's potential for rehabilitation, it is my decision to:** _____.



Richard J. Baltz, Center Director      Date Signed
**Name and Title of Deciding Official**



### Department of
### Veterans Affairs

# Memorandum

June 5, 2007

From: Chief, Medical Service (111)

Subj: *Proposed Discharge*

To: Dr. Brendan Ross
Medical Service (111)

1. It is proposed to discharge you from employment with VA based on the following reasons:

*Charge 1: Displaying unprofessional and discourteous behavior to a VA patient or family member*

*Specification 1:* You were assigned to treat Patient A. On one occasion when Patient A came in for a scheduled appointment, you asked patient A in the presence of his wife, "what does she do, wear the pants in your family? " or words to that effect. Your question was unprofessional and discourteous. You are charged with displaying unprofessional and discourteous behavior to a VA patient and family member.



*Specification 2:* You were assigned to treat Patient B. On one occasion when Patient B came in for a scheduled appointment, you screamed at the top of your voice to Patient B, "you should not be taking those medications, bring me every drug you have and I will tell you what you need to throw away", or words to that effect. Yelling at Patient B was unprofessional and discourteous. You are charged with displaying unprofessional and discourteous behavior to a VA patient.

*Specification 3:* You were assigned to treat Patient B. On one occasion when Patient B came in for a scheduled appointment, you stated to Patient B, "you should be able to follow instructions, you are not nine, you are 49" or words to that effect. Your comments to Patient B were unprofessional and discourteous. You are charged with displaying unprofessional and discourteous behavior to a VA patient.

*Specification 4:* You were assigned to treat Patient C. On one occasion when Patient C came in for a scheduled appointment, you stated to Patient C, "you need to go to a private doctor, look at all the jewelry and stuff you have on, you got money to go to a private doctor , you need to go to a private doctor and get what you want. You aren't even a service-connected veteran" or words to that effect. Your comments to Patient C were discourteous and unprofessional. You are charged with displaying unprofessional and discourteous behavior to a VA patient.

VA FORM
MAR 1989  2105



*Page 2*
*Proposed Discharge – Dr. Brendan S. Ross*

**Specification 5:** On or about September 21, 2006, Patient D filed a complaint with the patient advocate. Patient D indicated that she informed you that she never received an appointment for physical therapy. You replied to Patient D, " and you never will, the VA isn't going to waste money on you like that. The VA is here to give you what you need, not what you want" or words to that effect. Patient D also indicated that she stated to you that she thought the physical therapy might help her and maybe she would go see someone on her own. Your reply to Patient D was "I don't care", or words to that effect. Your comments to Patient D were discourteous and unprofessional. You are charged with displaying unprofessional and discourteous behavior to a VA patient.

**Specification 6:** You were assigned to treat Patient E.   On or about July 25, 2006, Patient E came in for a scheduled appointment. Patient E had several medications that needed to be refilled. As you pulled his medical record up in the computer system, you stated to Patient E some of these pills have got to go. You indicated you were cutting the medication for his prostate problem. Patient E asked you not to cut the medication as he would not be able to pee. You replied, "so you won't be peeing" or words to that effect. You proceeded to say you were cutting the blood pressure medicine. Patient E asked that you not cut his blood pressure medicine as it helps to protect his kidneys from diabetes. You replied in a loud and harsh tone of voice to Patient E, " protect your kidneys from what, man, you're 74 years old not 54, so why protect them" or words to that effect. Your comments to Patient E were inappropriate and unprofessional. You are charged with displaying unprofessional and discourteous behavior to a VA patient.

**Charge II:  Failure to provide patient assessment and treatment**

**Specification 1:** You were assigned to treat Patient E. On one occasion when Patient E came in for a scheduled appointment, you noticed his mason belt and immediately turned to your computer and pulled up a website of the National Masonic Organization. You showed Patient E and his wife pictures of the museum in Virginia and spent the entire office visit discussing the Masonic website. You failed to give Patient E an opportunity to state a medical complaint. You did not examine Patient E nor did you assess his medical condition and provide treatment. You are charged with failure to provide patient assessment and treatment on Patient E.

**Page 3**
**Proposed Discharge – Dr. Brendan S. Ross**

**Specification 2:**  You were assigned to treat Patient F, a male patient over 50 years old. Patient F requested a prostate exam on numerous occasions.  You did not examine Patient F, nor did you provide a prostate exam as requested.  You are charged with failure to provide patient assessment and treatment on Patient F.

**Specification 3:**  You were assigned to treat Patient G.  Patient G came to your office as a walk-in patient complaining of severe head, neck, ear and eye pain and stated he needed to go back to neurosurgery.  You replied, "no you don't, take these muscle relaxers", or words to that effect.  You did not examine Patient G to determine the source of his pain or make a referral for a consult.  You are charged with failure to provide patient assessment and treatment on Patient G.

**Charge III: Misrepresenting a Patient Medical Record by documenting physical exam findings when no examination was done.**

**Specification 1:**  Patient H was seen in your clinic on 09-07-05, 01-09-06, 6-28-06 and on 10-26-06.  The primary care notes you input into the medical record indicate that you physically examined the patient.  In a statement dated 11-20-06, Patient H states you never examined him.  You are charged with misrepresenting patient medical records dated 09-07-05, 01-09-06, 06-28-06 and 10-26-06 of Patient H by documenting physical exam findings when no examination was done.

**Specification 2:**  Patient I was seen in your clinic on 03-29-06.  The primary care note you completed for Patient I dated 03-29-06, indicate that you physically examined the patient.  Patient I complained to the patient advocate that you never put your hands on him at all, but just looked at the computer at notes that nursing staff had input.  You are charged with misrepresenting the patient medical record dated 03-29-06 of Patient I by documenting physical exam findings when no examination was done.

**Specification 3:**  Patient J was seen in your clinic on 04-27-06 and 10-27-06.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient J.  Patient J's spouse, who was in the room, complained to the patient advocate that you never touched her husband.  You are charged with misrepresenting the patient medical records dated 04-27-06 and 10-27-06 of Patient J by documenting physical exam findings when no examination was done.

*Page 4*
*Proposed Discharge – Dr. Brendan S. Ross*

**Specification 4:**  Patient K was seen in your clinic on 09-16-04 and 07-12-05.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient K.  Patient K complained to the patient advocate that you never put your hands on him.  You are charged with misrepresenting patient medical records dated 09-16-04 and 07-12-05 of Patient K by documenting physical exam findings when no examination was done.

**Specification 5:**  Patient L was seen in your clinic 05-03-05, 6-14-05 and 7-17-06.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient L.  Patient L testified under oath that you never examined him.  You are charged with misrepresenting the patient medical records dated 05-03-05, 06-14-05 and 07-17-06 of Patient L by documenting physical exam findings when no examination was done.

**Specification 6:**  Patient G was seen in your clinic 11-07-05 and 03-07-06.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient G.  Patient G testified under oath that you never examined him.  You are charged with misrepresenting patient medical records dated 11-07-05 and 03-07-06 of Patient G by documenting physical exam findings when no examination was done.

**Specification 7:**  Patient D was seen in your clinic 12-23-04 and 03-14-06.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient D.  Patient D testified under oath that you never examined him.  You are charged with misrepresenting patient medical records dated 12-23-04 and 03-14-06 of Patient D by documenting physical exam findings when no examination was done.

**Specification 8:**  Patient B was seen in your clinic 05-09-05 and 05-12-06.  The primary care notes you completed for each visit indicate that you did a physical exam of Patient B.  Patient B testified under oath that you never examined him.  You are charged with misrepresenting patient medical records dated 05-09-05 and 05-12-06 of Patient B by documenting physical exam findings when no examination was done.

**Specification 9:**  Patient M was seen in your clinic on 08-31-06.  The primary care note you completed for this visit indicates that you did a physical exam of Patient M.  Patient M testified under oath that you never examined him.  You are charged with misrepresenting the patient medical record dated 08-31-06 of Patient M by documenting physical exam findings when no examination was done.



**Page 5**
*Proposed Discharge – Dr. Brendan Ross*

**Specification 10:** Patient N was seen in your clinic on 06-06-05 and 03-22-06. The primary care notes you completed for each visit indicate that you did a physical exam of Patient N. Patient N's spouse, who was in the room, testified under oath that you never examined him. You are charged with misrepresenting patient medical records dated 06-06-05 and 03-22-06 of Patient N by documenting physical exam findings when no examination was done.

**Specification 11:** Patient F was seen in your clinic on 03-01-05, 05-24-05 and 10-13-05. The primary care note you completed for each visit indicate that you did a physical exam of Patient F. Patient F testified under oath that you never examined him. You are charged with misrepresenting patient medical records dated 03-01-05, 05-24-05 and 10-13-05 by documenting physical exam findings when no examination was done.

### Charge IV: Endangering the safety of a VA patient

**Specification:** On August 29, 2006, the spouse of Patient L requested that you refill Patient L's heart and blood pressure medicine. You argued with the patient's spouse stating that he had been out of the medicine since February and could not have possibly been taking the medicine. You refused to refill the medicine and told the spouse they would need to make an appointment. The patient and spouse proceeded to urgent care where the prescription was immediately refilled. Your actions were inconsistent with the agency's mission of providing medical care for veterans. You are charged with endangering the safety of VA Patient L on August 29, 2006.

### Charge V: Displaying poor patient interaction skills

**Specification:** Patient O came to your clinic complaining of fever. You indicated to Patient O you were going to put him on medication for a prostate infection. You advised Patient O to call you in three days and you would tell him whether or not he needed to stay on the medication. Patient O called your office on three occasions as you instructed and you did not return his calls. Patient O contacted the Patient Representative who then contacted the telephone advice nurse. You then called Patient O on the telephone and abruptly stated, "Patient O you have lung cancer" or words to that effect. Your telephone call to Patient O to abruptly state this diagnosis was inappropriate. You are charged with displaying poor patient interaction skills.



*Page 6*
*Proposed Discharge – Dr. Brendan S. Ross*

### Charge VI: *Inappropriate contact with a witness in an official agency investigation*

*Specification:* On November 8, 2006, Kathleen Oglesby, RN was interviewed by the Administrative Board of Investigation that was convened to investigate allegations of your inappropriate conduct and communication with patients, family members and staff. On that date, following the interview, you called for Ms. Oglesby to come to your office. When Ms. Oglesby reported to your office as you requested, you closed the door and began questioning Ms. Oglesby about her interview with the Administrative Board of Investigation. You asked Ms. Oglesby why she did not tell you about the interview and asked her what she said to the Board. Ms. Oglesby informed you that she was under oath and had been directed not to discuss her interview with anyone including you. You again asked Ms. Oglesby what she had been asked by the Board. Ms. Oglesby again informed you she was under oath and would not discuss her testimony with you. Your questions to Ms. Oglesby regarding her interview with the Board charged with investigating your actions was inappropriate. You are charged with inappropriate contact with a witness in an official agency investigation.

2. You have the right to reply to this notice orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge(s) are unfounded and any other reasons why your discharge should not be effected. You will be given fourteen (14) calendar days from receipt of this notice to reply to these reasons orally or in writing, or both orally and in writing, and to submit any affidavits or other documentary evidence. Your written reply should be submitted to the Center Director. The Center Director will receive your oral reply.

3. The evidence on which this notice of proposed action is based will be provided to you. Please contact Samuel Evans, Sr., at (601) 364-1239, to obtain a copy of the evidence file.

4. On September 27, 2004, you were suspended for seven (7) calendar days for unauthorized absence, failure to follow proper leave requesting procedures, and failure to provide appropriate and accurate documentation of medical care provided. This past record will be taken into account in determining proper disciplinary action, if one or more of the above charges is sustained. You may make a statement expressing your views as to the consideration to be given such past record in determining proper action.

5. You may be represented by an attorney or other representative of your choice at all stages of this matter. *Any representative must be designated in writing.*

*Page 7*
***Proposed Discharge – Dr. Brendan S. Ross***

6. The final decision to effect the action proposed has not been made. The Center Director, who will make the final decision, will give full and impartial consideration to your reply(ies), if submitted.

7. If it is the decision of the Center Director that you be discharged, your discharge will be effective not less than 30 calendar days from the day after the date of receipt of this notice.

8. Consistent with the mandate in the Department of Veterans Affairs Health-Care Amendments Act of 1985 (Pub.L.99-166), it is the policy of VA to report to the State licensing boards those terminated (voluntarily or otherwise) health-care professionals whose professional clinical practice appears to have so significantly failed to conform to generally accepted standards of clinical professional practice as to raise reasonable concerns for the safety of patients. Please be advised that, in the event you are found not to meet standards of care, consideration will be given whether, under these criteria, you should be reported to the State licensing board(s).

10. You will be retained in an administrative leave status during the advance notice period.

*Stephen A. Geraci, M.D.*

Stephen A. Geraci, M.D.

President, NFFE, Local 589

John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

Attachment:   Douglas Factors

# TAB 9

7 June 2007

Stephen A. Geraci, M.D.
Chief, Medical Service
G.V. (Sonny) Montgomery VAMC
1500 East Woodrow Wilson Drive
Jackson, MS 39216

Re: Douglas Factors

Dear Dr. Geraci:

The so-called "Douglas Factors" attached to your Memorandum of Proposed Discharge of June 5, 2007 d o n ot a ccurately r eflect m y s even-year t enure a t t he M edical C enter, i nasmuch a s t hey accept the lodged Charges as already adjudicated to my disfavor, contain unsubstantiated judgments, report allegations as facts, and, in one egregious instance, state an outright falsehood; thus, I respectfully request that you redraw and resubmit this document. Moreover, my attorneys have directed me to request the documentation underlying your responses; a request that is detailed in an attachment. As you have imposed a fourteen (14) calendar day time limitation on my reply to your Proposed Discharge, I further request that you expedite these corrections and that you forward me a recast document by close of business Monday, June 11.

I am dismayed that the tenor of your factor analysis assumes that it has already been determined that I committed the offenses alleged in your Memorandum, even though in paragraph six (6) of your proposal you state a "final decision" as to the legitimacy of the Charges has not been made. Your declarative formulations belie your assurance that "full and impartial consideration" will be afforded my reply to your proposed adverse personnel action. Furthermore, as prepared for the Deciding Official's signature, you have created a form that allows only the acceptance of your analysis, thus exempting your judgments from the scrutiny of a due process review. I believe the only conclusion one can draw from the foregoing is that my employee rights have been denied in a "decision before hearing."

An alternative explanation for these oversights, discrepancies, and factual misrepresentations is that you were not actively involved in the preparation of this flawed analysis. In my experience as your subordinate, I have always known you to be a supervisor of honor as well as integrity. The current proceedings will have grave implications for my family's well-being as well as my professional career. I deny that I ever intentionally harmed a patient under my care, and I have repeatedly expressed my regret for occasioning any sorrow to a Veteran or family through a misapprehended encounter. Thus, I request that your review the Douglas Factor analysis submitted, and that you bring it into line with my Official Personnel File (OPF), Proficiency Ratings, and our previous discussions and my previous corrective efforts at your directions.

I have recently reviewed my OPF, which contains no information regarding tardiness, "disruption" of clinic processes, nursing staff complaints of insulting language, or "falsification of records." I am unaware of any pending medical malpractice lawsuits lodged solely on the basis of my care or of any previously stated "patient safety" concerns regarding my care. With regard to my Proficiency Ratings, you have recently judged the quality of care I provide as satisfactory, and you have not issued me any written warning nor recommend any professional remediation, as required by the Labor-Management Agreement. Most egregiously, you fail to note my proactive

contact regarding work stressors for which I sought the services of the Employee Assistance Program, certainly a "mitigating circumstance" as outlined in factor analysis considerations.

You write that "At no time did Dr. Ross convey to service leadership any issues which could be considered mitigating to these behaviors (See paragraph j)." To the contrary, I notified Dr.Kent Kirchner, Chief of Staff, with a copy to you, by electronic mail on April 8, 2005 that "I believe[d] I need to seek counseling for "stress," for my growing irritability and work place frustrations…my failure to adequately cope with and appropriately respond to work stressors (Available for review, if requested)." Additionally, I advised you that I would seek counseling, that I would waive my privacy rights, and that I would keep you abreast of my therapy. I subsequently reported to you my short-term use of psychotropic medications. This self-identified issue, congruent in time with your lodged Charges, surely merits mention in your factor analysis.

Again, given the gravity of this matter, I respectfully request that you fully engage this supervisory responsibility and that you redraw your submission more in line with the documented record of my tenure at the Medical Center. I anticipate your timely response.


Respectfully submitted,



Brendan S. Ross, M.D.
Staff Physician

Cc: Samuel Evans, Sr., Director, OHRM; Joseph Simon, R.Ph., President, NFFE Local 589; John J. Ross, III, Esq.

Attachment: Douglas Factor Remediation

2

**Douglas Factor Remediation**

Factor (a.)

It is stated that there have been frequent and voluminous "complaints" concerning my client and thus the "efficiency of the service" has been negatively impacted.

Please provide the documentary evidence supporting this factual claim, including a copy of the Policy Directive providing criteria for rating an Official Report of Contact as a "complaint."

Please substantiate the nature of the disruption to clinic functioning.

Factor (b.)

Please document that at the direction of his supervisors, my client cared for a panel of patients who were Neuro-psychiatrically impaired and that Medical Center policy required him to care for patients who were unscheduled, the so-called "Urgent Care" or "Walk-in" patient.

Factor (c.)

Please be aware that we deny that a valid Suspension was issued on that date, as no duly authorized Decision Official rendered this Major Adverse Personnel Action.

Factor (d.)

Please provide the basis for the claim that my client experienced a "high volume of patient complaints." That is, either conduct and report back an analysis of the non-judgmental Reports of Contact per Patient Encounter ratio for similarly situated clinicians or provide the data necessary for us to conduct such a pertinent analysis.

Please provide documentation that my client was "regularly and consistently late for patient appointments," allowing for Medical Center demands that he provide timely care for unscheduled patients.

Factor (e.)

Please provide evidence regarding the stated "Nursing staff" reports. Although cautiously worded as "verbal" complaints, please provide the contemporaneously documented supervisory notes of the date, place, time, circumstance, and statement of each of these "occasions." Also, report what investigation these "complaints" prompted, including my client's responses, and what subsequent Administrative action was taken.

Please provide evidence, rather than non-material hypothetical assertions, that my client's professional actions or omissions endangered patient safety. Additionally, provide information on what counseling my client received from the Ambulatory Services

3

Committee and what professional remediation was required by my client's supervisors for these referenced deficiencies in professional conduct.

Factor (g.)

Please provide documentation that my client's care is notorious for being of substandard quality, especially given his unblemished seven (7) year tenure for professional competence as documented in his Proficiency Ratings.

Please provide a itemized history of all litigated malpractice lawsuits over my client's tenure.

Factor (h.)

Please answer this statement truly and honestly: my client has never been advised of a lack of integrity in his medical record reporting.

Factor (i.)

Please answer this factor prompt without any assumption of guilt as to the allegations lodged, which is his employee right.

My client has expressed his willingness to remediate any identified deficiency in his professional performance, as he clearly demonstrated in the Quality Improvement activities for Silver Clinic supervised by the Chief, Medical Service and in his strict adherence to the current Leave Policy that now adheres to the Labor-Management Agreement.

Please provide the basis by which a motivation was ascribed to my client's alleged offenses, i.e. "to avoid accusations of negligence."

Factor (j.)

Please correct this false assertion. My client clearly conveyed his job stress and employee frustrations to the Chief of Staff and the Chief, Medical Service. My client identified patient appointment burdens, inadequate clinic facilities, lack of physician line oversight, and the inequitable allotment of employee entitlements such as Administrative Days as contributing to job dissatisfaction. Also, please note that no corrective action was taken by Administration authorities.

Your prompt attention to these requests is required to meet the fourteen (14) calendar day limitation on our reply placed by the Memorandum of Proposed Discharge issued Dr. Brendan S. Ross on June 5, 2007.

Respectfully Submitted,
John J. Ross, III, Esq.

4

# TAB 10



**G.V. (SONNY) MONTGOMERY**
**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
1500 East Woodrow Wilson Drive
Jackson MS  39216

In Reply Refer To:

June 8, 2007

Dr. Brendan S. Ross
231 Winged Foot Circle
Jackson, MS  39211

**Subject: Douglas Factors**

Your letter dated June 7, 2007, regarding the *"Douglas Factors"* has been forwarded to

the Center Director and will be included in the record for review and consideration.  As

indicated in paragraph 2 of the proposed discharge, *"your written reply should be*

*submitted to the Center Director"*.

Stephen A. Geraci, M.D.
Chief, Medical Service

cc:   John J. Ross, II, Esq.
       7021 Marlan Drive
       Alexandria, VA  22307

# TAB 11

6 June 2007

Stephen A. Geraci, M.D.
Chief, Medical Service
G.V. (Sonny) Montgomery VAMC
1500 East Woodrow Wilson Drive
Jackson, MS 39216

Re: Proposed Discharge

Dear Dr. Geraci:

I am in receipt of your Memorandum of Proposed Discharge dated June 5, 2007. To facilitate my oral and written reply, I will need access to the Electronic Medical Record, CPRS. As per the Order of the Center Director, I am currently barred from the Medical Center campus without prior approval. In a telephonic communication of this date, Mr. Samuel Evans, Sr. advised my legal representative that requests for Medical Center access should be forwarded to the Charging Official.

Thus, please take this letter as a formal request for access to Medical Center, including computer access to CPRS.

As you have allotted me only fourteen (14) days to formulate my written reply to the Charges contained in the Memo, I would appreciate you expediting action on this request.

Please have your delegate contact my lead counsel to make the necessary arrangements for honoring my request, or feel free to call me directly.

Respectfully submitted,


Brendan S. Ross, M.D.
Staff Physician
(601) 940-1337

Cc: John J. Ross, III, Esq.
(703) 765-3075

# TAB 12



**DEPARTMENT OF VETERANS AFFAIRS**
**Medical Center**
**1500 East Woodrow Wilson**
**Jackson MS 39216**

June 7, 2007                                                    In Reply Refer To:

Dr. Brendan S. Ross
231 Winged Foot Circle
Jackson, MS 39211

**Subject:  *Request for Access to Medical Center and Electronic Medical Records***

1.  Your June 6, 2007, letter to Dr. Stephen A. Geraci requesting access to the medical center and to CPRS electronic health records has been referred to my office.

2.  Your request for access to the electronic Medical Record, CPRS is denied.  However, as directed by letter to you dated January 29, 2007, if you have a need to make contact or return to the medical center for any reason, you should contact Acting Chief, Police Service, Jesse Lumpkins, (601) 362-4471, extension 5750.  Chief, Lumpkins will coordinate your visit.  Any arrangements for meeting on VA property will be subject to clearance by the Acting Chief, Police Service in advance.

Richard J. Ball
Center Director

cc:  John J. Ross, II, Esq.
      7021 Marlan Drive
      Alexandria, VA  22307

# TAB 13

June 6 2007

Richard J. Baltz
Center Director
G.V. (Sonny) Montgomery VAMC
1500 East Woodrow Wilson Drive
Jackson, MS 39216

Re: Proposed Discharge

Dear Mr. Baltz:

I am in receipt of a Memorandum of Proposed Discharge dated June 5, 2007 issued to me by my Service Chief. In accordance with paragraph two (2) of the Memo, I am afforded the "right to reply to this notice orally, or in writing, or both orally and in writing…" Additionally, the Memo advises that you will be the recipient of any oral or written reply.

Therefore, this letter serves as notice that I will reply to this Proposed Discharge both orally and in writing.

The Memo also advises that I "will be given fourteen (14) calendar days from receipt of this notice to reply..," which would be Thursday June 20, 2007. Given the potential impact of these Charges on my employment a nd c areer potential and thus t he n eed to a dequately a ddress e ach a nd every C harge a nd Specification in detail, my counsel advises me that we can foresee a minimum two (2) business day oral presentation. If not otherwise advised, we will assume an oral presentation date of June 20 and June 21, reserving the right to extend and revise our reply as needed.

To facilitate our oral reply, we will require a conference room equipped to present a Power Point Presentation. In your notice confirming the presumed presentation dates, please advise us of the location of the room assigned for this oral reply. This advance notice is required so that we can make arrangements for verbatim documentation of the proceeding.

Respectfully submitted,

Brendan Sean Ross, M.D.
Staff Physician

Cc: John J. Ross, III, Esq.

# TAB 14



**DEPARTMENT OF VETERANS AFFAIRS**
**Medical Center**
**1500 East Woodrow Wilson**
**Jackson MS  39216**

June 7, 2007

In Reply Refer To:

Dr. Brendan S. Ross
231 Winged Foot Circle
Jackson, MS  39211

### SUBJ:  *Oral/Written Reply – Proposed Discharge*

1. Your letter dated June 6, 2007, regarding your oral and written reply to the proposed discharge dated June 5, 2007 has been received and reviewed.

2. I will be available to hear your oral reply on *one* of the following days - Monday, June 25, 2007, from 1:00 p.m. to 3:00 p.m. *or* Wednesday, June 27, 2007, from 1:30 p.m. to 3:30 p.m.   I have an established practice of allotting up to a two hour window to hear an oral reply, which I consider reasonable and appropriate.

3. The oral reply meeting is not the appropriate stage of the process for a court reporter. However, you are free to take your own verbatim notes. In addition, as a limited time is allotted for your oral reply, additional information and/or documentation should be an attachment to your written reply.  A power point presentation is not appropriate.  You may wish to attach the printed power point slides to your written reply.

3. The oral reply will be heard in the *Director's Conference Room, Room I-200D,* in the Director's Suite, on the third floor.  You may contact Ms. Gina Lack, (601) 362-4471 extension 1435 to confirm one of the above dates to present your oral reply.

*Richard J. Batz*
Richard J. Batz
Center Director

cc: John J. Ross, III, Esq.
    7021 Marlan Drive
    Alexandria, VA  22307

# TAB 15

26 June 2007

Richard J. Baltz
Center Director
G.V. (Sonny) Montgomery VAMC
1500 East Woodrow Wilson Drive
Jackson, MS 39216

Re: Proposed Discharge

Dear Mr. Baltz:

I am in receipt of your letters of June 21, 2007. My client, Dr. Brendan Ross and I will be present on the rescheduled date of July 10, 2007 to offer his oral reply. I have been designated by him as the only representative entitled to speak on his behalf.

After reviewing the Evidence File provided in support of the Memorandum of Proposed Discharge of June 5, 2007, it is my professional opinion that the Charges and Specifications are not adequately substantiated therein. Nevertheless, I recognize that you may reach a different conclusion. Therefore, I request that if you sustain any Specification or Charge deemed sufficient for you to discharge my client, with the related reporting requirements, that the date effective be postponed until after the appeal process is completed.

I believe that this request should be granted: 1. Implementing such a grave penalty will have dire immediate consequences on my client's ability to practice his chosen profession, to which he has devoted twenty-five years of education and training; 2. My client has never been the subject of a report to any regulatory authority in eighteen years of medical practice, in seventeen hospitals, in five states; 3. This drastic penalty would be imposed prior to my client being afforded a due process evidentiary hearing, thus raising Constitutional concerns.

I trust you will give this request all due consideration and promptly grant us relief.

Sincerely yours,

John J. Ross, III, Esq.
7021 Marlan Drive
Alexandria, VA 22307

Cc: Joseph Simon, R.Ph., President, NFFE Local 589

# TAB 16

FW:

**From:** Ross, Brendan S. (VHAJAC) <Brendan.Ross@va.gov>
    **To:** brossmedicine@aol.com
**Subject:** FW:
    **Date:** Fri, 11 May 2007 3:42 pm

**From:** Geraci, Stephen (VHAJAC)
**Sent:** Monday, April 11, 2005 5:17 PM
**To:** Ross, Brendan S. (VHAJAC)
**Cc:** Kirchner, Kent A. (VHAJAC)
**Subject:** RE:

As mentioned to you this morning, the Employee Assistance Program is open to all VA employees. Self-referrals are encouraged. This program provides up to eight one-hour counseling sessions and once you are registered, for prescheduled appointments, you will receive Excused Absence. Records from this program are handled with the same confidentiality as medical records; as your supervisor, I am only allowed/required to know of the appointments/times but the contents, recommendations, etc. are strictly confidential. If additional resources are needed, they can assist in outside referrals to appropriate sources.

I have requested information from HR and will forward this to you as soon as it is received.

**Stephen A. Geraci MD**

Professor and Vice Chair, Internal Medicine

University of Mississippi School of Medicine

Chief, Medical Service

G.V. (Sonny) Montgomery VAMC (111)

1500 E. Woodrow Wilson Dr.

Jackson, MS 39216

Ph:  601-364-1251

Fax:  601-364-1278

Email:  Stephen.Geraci@med.va.gov

FW:

-----Original Message-----

**From:**  Kirchner, Kent A. (VHAJAC)

**Sent:**  Monday, April 11, 2005 2:34 PM

**To:**  Ross, Brendan S. (VHAJAC)

**Cc:**  Geraci, Stephen (VHAJAC)

**Subject:**    RE:

Brendan,

Usually for these type of problems we recommend that the employee make contact with our Employee Assistance Program. The evaluations and discussions with that group are confidential and they can point to what is best using resources both inside and outside the institution. Dr Geraci as your service chief can help you get connected with this program.



Kent

Kent A. Kirchner MD

Chief of Staff

G.V. Montgomery VAMC

Jackson, Ms

Tel.(601) 364-1207

Fax (601) 364-1456

-----Original Message-----

**From:**  Ross, Brendan S. (VHAJAC)

**Sent:**  Friday, April 08, 2005 4:43 PM

**To:**  Kirchner, Kent A. (VHAJAC)    ( CHIEF  OF  STAFF )

**Cc:**  Geraci, Stephen (VHAJAC)

**Subject:**

Dear Dr. Kirchner:

FW:

Within the context of the institutional leave policy, I am writing to request your urgent guidance in addressing concerns I have for my health.

Specifically, I believe I need to seek counseling for "stress," for my growing irritability with work place frustrations.

As such a medical referral would be proactive, but might presumably entail ongoing care, and as I have no intention of falling afoul of the rules directing professional conduct at the medical center, I would like your advice as to how to acquire and record leave to pursue such an assessment.

As you may be aware, I have visited emergency rooms twice over the last two weeks for decompensated asthma. I have only been treated with the emergent use of nebulized bronchodilators once over the preceding ten years, this is distinctly unusual for my mild-persistent, exercise-induced asthma.

With no sinus complaints, a clear chest x-ray and spiral CT of the thorax, and a medication regimen that includes azithromycin, Advair, Atrovent, albuterol, Singulair, and prednisone, my treating physicians presumed that I would be bronchospasm-free.

Given that both attacks occurred in the middle of the night, fiber optic laryngoscopy was performed, which revealed gastroesophageal reflux disease as the culprit trigger. Although I was placed on Prilosec therapy, I desire to address the underlying source of this peptic acid damage: my failure to adequately cope with and appropriately respond to work stressors.

I plan to seek psychological and psychiatric input. I would greatly appreciate a response from you, Doctor Geraci or Human Resources, as to what my reporting responsibilities might be.

I am unaware of any intramural resources for such assistance, and would be more comfortable seeking extramural help. I would gladly waive any privacy rights you may require in order to judge my competency or therapeutic progress.

I can assure you that I have no substance dependency problems, do not suffer from any psychotic symptoms, and have no thoughts of harm to myself or others.

Thank you for your time and attention to this matter.

Brendan Ross

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BRENDAN S. ROSS, M.D.,                    )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )      Civil Action No. 07-1163 (JDB)
                                          )
DEPARTMENT OF VETERANS AFFAIRS,           )
                                          )
                    Defendant.            )
                                          )

---

## <u>ORDER</u>

Plaintiff, Brendan S. Ross ("Dr. Ross"), has moved for a temporary restraining order barring Defendant, Department of Veterans Affairs ("VA"), from discharging him, revoking his practice privileges, reporting him to state licensure boards and/or reporting him to the National Practitioners Data Bank until such time as he has received a due process hearing and this Court has reviewed said hearing.  The Court has reviewed the briefs and argument of the parties and it is hereby

**ORDERED** that Plaintiff's motion is granted, and it is

**FURTHER ORDERED** that the VA is enjoined from discharging Dr. Ross, revoking Dr. Ross' practice privileges, reporting Dr. Ross to any state licensing board and/or reporting him to the National Practitioners Data Bank, and it is

**FURTHER ORDERED** that the parties shall agree upon a briefing and argument schedule for a motion for a preliminary injunction and that this Order shall remain in full force and effect until such time as the parties are heard from and this Court decides said motion for preliminary injunction.

Dated:  July _____, 2007

_____
United States District Judge

ROSS- Order.doc